[No. C058061. Third Dist. Mar. 24, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY GREG UECKER, Defendant and Appellant.

## Counsel

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**ROBIE, J.**—A jury found defendant Danny Greg Uecker guilty of stalking two women. The trial court found he had four strike priors and sentenced him to 50 years to life in prison.

Defendant appeals, raising the following five contentions: (1) there was insufficient evidence to support both stalking convictions; (2) the trial court prejudicially erred in admitting certain evidence of defendant's prior bad acts; (3) the court prejudicially erred in admitting evidence defendant was a registered sex offender; (4) the court erred in refusing to dismiss some or all of his strike priors; and (5) defendant's sentence is cruel and/or unusual punishment.

Disagreeing with these contentions, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *Count 1—Stalking of M.*

M. is a service representative at the Social Security Administration in Shasta County. Her first encounter with defendant was at her work parking lot around the end of May or beginning of June 2006 when she noticed him sitting by her white Mustang between noon and 1:00 p.m. Defendant was on his bicycle, parked three to four feet from her car. M. commented that bicycling was good exercise. Thereafter, defendant would be beside M.'s car every day when she would go to lunch, even when her lunch hour varied. They would exchange greetings, and defendant sometimes would try to engage M. in further conversation. On occasion M. would oblige, but she always would say she had to get back to work because she was running late. She was polite to defendant because her job taught her to treat human beings with kindness and respond to their conversation. This pattern continued week after week, month after month.

About the same time defendant starting hanging around M.'s car, he started leaving notes for her on her car. The first note included his telephone number and read as follows: " 'If you want to go riding bicycles, give me a call.' " M. ripped up the note and threw it away because she "wasn't interested."

In September, M. started parking on the street because she no longer needed the shade the original parking spot provided and somebody else had started parking in her spot. Defendant approached her at her new spot and asked whether she was trying to " 'get away from [him].' " She said " '[n]o.' " He continued showing up at her new parking spot, leaving her notes and trying to engage her in conversation. One of these notes read as follows: " 'I'm not a homeless guy. I have a job. I have a roof over my head. I want to go out with you.' " She threw it away and did not talk to him about

the note. His behavior was beginning to concern M., and she decided she needed to "prepare for stuff" "if he got crazy or something." She bought Mace and started taking "evasive" actions by moving her car.

But defendant persisted. His next note was a Christmas card that read as follows: "[M.], [¶] I hope you have a nice holiday season! I know how we met is a little rare, and I look like a transient on the side of the road but I can assure you I do have a full time job and a roof over my head. [Smiley face.] Listen, no strings attached, if ever you want to call sometime just to talk, I'm open for it, if you haven't lost my number? Its [*sic*] really nice talking to you as an attractive, mature lady! I'm not looking for anything super serious but I wouldn't mind the companionship on a cold, rainy day, sipping hot chocolate. [Smiley face.] [¶] Danny [¶] P.S. Nice car. [Smiley face.] I like it better than the Mustang." (Capitalization omitted.)

M., who had bought a Toyota Camry a week before, was concerned and terrified defendant knew her every move. She went inside her workplace and talked with the administrative secretary for management, Nancy Patterson, and told her the following: " 'Something's not right. This man just doesn't go away. And I don't know what to do anymore. I thought I could handle it on my own.' " M. had now become so fearful of defendant she stopped going out in the evenings and shopping and had her girlfriend stay with her a few times.

The next day, M. was so scared she parked in another location that was 10 feet from her work's exit. As she was walking out of work, defendant approached her on his bicycle and asked if she got his Christmas card. She thanked him but "[f]irm[ly]" said she was "not interested" because she was "seeing someone" and asked whether his statement about her being a mature woman implied she was old. Defendant said "no," "got mad," and asked why she had been flirting with him. She said she had not been and was simply responding to his conversation. She then announced she had to go pick up her son, and defendant left.

The following day, M. took a much later than normal lunch because her son was very ill. She did not see defendant but received the following note: "[M.], [¶] I'm not on my bike anymore. The weather is too cold, wet or unpredictable. [¶] I'm in a small brown truck w/ a camper shell. I still spend my lunch hour here because its [*sic*] quiet. I don't like to keep leaving notes on your car. Would much rather talk to you. [Smiley face.] [¶] Ok so you're not mature! You're an immature trouble making brat! Now what? [Smiley face.] [¶] What's a guy gotta do to get a call from a beautiful woman? I'll be here tomorrow if you want to see me. You sure have some funny lunch hours. [Smiley face.] [¶] Dan."

When M. read this note, she "really freaked out." She "started to realize that this is more than just someone interested in dating, that this guy is just watching [her] every move." She "started parking way down the road" so defendant would not be able to see her car, had people walk her to her car, and alerted the guard at her workplace. As with the last note, M. gave it to Patterson. M. did not call the police herself because office protocol required her to go through management.

Patterson spoke to her manager, Linde Ballentine, about the situation, and Ballentine called M. into her office. M. told Ballentine defendant had been leaving notes on her car, "he was now scaring her with some of the things in the notes, [and] that she didn't know how to interpret them." M. was crying on and off, was shaky, and had to sit down several times.

The following day, December 19, Ballentine saw defendant in his truck eating lunch. He was positioned "with a good view of the entry to the parking lot where the cars come in" and of the "employee entrance." Management then contacted law enforcement.

B

*Count 2—Stalking of J.*

J. is a part-time real estate agent in Shasta County who began her career in November 2006. To generate business, she posted real estate advertisements with her photograph and phone number in local newspapers and magazines.

At the end of November or early December 2006, J. received a phone message from "Danny" saying he was looking for a "livable shack in the boonies for less than 60,000 dollars." J. returned his call, and when she had found a couple of houses that might work, she asked for his last name so she could mail the information to him. Defendant said it was "Eucker."

Defendant then began calling J. a couple of times a day both on her cellular phone and her office line. She thought his messages were "a little too comfortable and playful." He joked about his friends coming over and "rid[ing her] horses" after she mentioned she liked the country and had horses. He told her she had a "really cool voice" and he could " '[p]robably talk to [her] all day.' " That message left her with a "haunting and violating feeling." In reference to a listing of property she had found him in "[n]ot the greatest area," he asked if she ever went to check the places out and hinted she should take him there. She had no intention of doing so because she "wanted to make sure [she] was coming back." She pressed him for information to help him qualify for a loan, but he never provided any and simply wanted more listings.

During the second week of phone calls, defendant left a message stating he had something to tell J. He then laughed and said, " 'Oh, no, never mind. If you're curious enough, you'll call back.' " When J. did not call back, defendant called her a couple of days later and asked if she had received his message. When she said she had, defendant asked her, " 'Do you like surprises?' " J. responded that she was " '[n]ot particularly fond of them.' "

By now, J. was questioning defendant's credibility. He had said a friend had referred him to her, which she knew was a lie because defendant was her first client. J. decided to check Megan's Law database to see if defendant was listed. When she tried Danny "Eucker" nothing came up. When she tried Danny "Uecker" she saw defendant's picture with his residence address listed as a hotel. J. drove by the hotel several times to look at the trucks parked there, since defendant had told her he drove a truck. She "wanted to get a visual of every truck in there, so in case he pulled up behind [her, she] would know" and "wouldn't get caught off guard."

At some point after she learned defendant was a "sex offender," defendant left a message for her saying he wanted to come by the office. J. responded by parking her car "far out in the parking lot backwards, so it wouldn't look like a real estate car," putting her hair in a knot, wearing sweats, and "frump[ing] on in." She asked coworkers to let her know if anybody came to the door looking for her.

A couple of days after their last phone contact, defendant left the following "irate" message: " 'I guess that's what you realtors do, you just drop us.' " J. responded with the following message: " 'I'm a little offended that, you know, you would speak to me that way because I had been trying to help. Every step of the way. And didn't really appreciate that.' " She falsely told him she was quitting the residential real estate business to focus on commercial real estate and she would send him to someone who could help him. Thereafter, J. decided not to host open houses and asked her manager whether she could put someone else's photograph in the advertisements.

Defendant called J. back about three times after her last message. The first two messages were lengthy and extremely apologetic. In one, defendant said the following: " 'I started this with you, [J.], because you didn't treat me like everybody else—some other realtors. So, with all due respect, I'd like to finish this with you. But I want to handle this with you—I want you to handle this or at least handle my issues, anyway.' " The message scared her. In another, defendant said the following: " 'I'm sorry. I shouldn't have yelled at you like that. I had some words with a buddy at work. It wasn't your fault, but I want you to finish what you've started here with me. I know you're doing the commercial thing, but I want you to finish what you started with

me.' " J.'s reaction to the second message was, "this guy is like talking to a girlfriend or something . . . [i]t . . . just . . . didn't s[i]t well, either." The third said, " 'Hey, I just want, you know, out of Dodge and by now, you probably know why.' "

J. reported defendant's conduct to law enforcement on December 13, 2006. She was afraid of defendant and felt trapped by him.

In all, defendant called her about 30 times over a three-week period, and of those calls, six to 10 were direct conversations.

Defendant was arrested on December 21, 2006.

C

*Defendant's Conversations with His Cellmate Almeda*

From June 2007 to August 2007, defendant and Richard Almeda shared a cell in the Shasta County Jail.[1] During their time together, defendant told Almeda about his past crimes.

Defendant said he had raped 20 women, favoring petite, small women with long brown hair. He preferred women with long hair because "he could wrap their hair around his arm and pull on it backwards."[2] He would get into the victims' lives by drawing them in "under false pretenses." He wanted to buy a cabin in the country when he was released so he could take his young victims there. Defendant then described specific acts he had committed.

While in the Army as a teenager, he spent time in prison for beating a woman while trying to take her purse.

While in the Army stationed in Germany, he raped a petite woman with long brown hair named K.G. who was a bartender at a "rec club" he frequented. He waited until closing time when K.G. was the only one there, snuck up behind her, forced her into the office, and "started breaking her down mentally" by telling her she could not get away and that he was going to do what he wanted. He then raped her on the couch in the office.[3] Defendant was convicted by court-martial of assault and battery for this incident.

---

[1] Almeda was facing felony "[c]heck fraud" charges. He was on antipsychotic and antide-pressant medication while testifying.

[2] The prosecutor here argued without objection that M. and J. both had long brown hair.

[3] K.G. testified to a different version of this attack. According to her, defendant came into the then closed recreational center and put his hand across her face and over her mouth. She elbowed defendant "very sharply and effectively," screamed "at the top of [her] lungs," and "[m]any people came to [her] aid."

In 1991 when defendant was approximately 26 years old, he assaulted a petite woman with long black hair named S.A. he met at a gas station. He impersonated an undercover police officer and reprimanded her for swerving. When she drove off, he followed her in his car and flashed his lights to induce her to pull over. His plan was to get her into his truck, tie her up with bungee cords, and rape her. He slapped her in the face, causing her to "fl[y] into [a] ditch." When he tried to get her into his truck, two people in a car stopped by the side of the road, and S.A. called out for help. Defendant drove away but eventually was apprehended.[4] As a result of this conduct, defendant was convicted of attempted kidnapping.

Within a few months of attacking S.A., defendant raped R.P. He saw an advertisement for babysitting services and thought the babysitter might be "what he was looking for," i.e., someone with "a nice face, a nice butt and nice, long hair." Using the ruse of babysitting, defendant induced R.P. to come to his trailer. After 20 to 30 minutes of small talk, he announced there were "no kids" and that she was " 'here for [him.]' " She put up a struggle, but he was able to rape her three times using "pre-arranged" ropes that were tied to the bed. He also made her wash her hair to "show[] her that he [w]as in control over her."[5] As a result of this conduct, defendant was convicted of three felony offenses including forcible rape.

Defendant told Almeda he was in custody for stalking a woman who worked at the Social Security office. Laughing, defendant said he wanted to take her on a bike ride on the Sacramento River trail because it was secluded with a lot of bushes and trees.

Defendant told Almeda that in the one or two years preceding his arrest in the stalking case, he would go to stores like WinCo and follow young women around. He started up a conversation with one store clerk so he could "get close to her" and ultimately rape her.

He once worked for Liddell Construction and made friends with a young lady with long black hair working at the front desk because he wanted to rape her.

After Almeda moved out of defendant's "pod" in August, defendant sent him three letters, which he kept. In one letter dated September 12, 2007, defendant said he was " 'thinking about [his] girls all the time and [Almeda was] nowhere to talk to' " and put a "smiley face" next to that sentence. Almeda took that to be a reference to defendant's prior victims. In another

---

[4] S.A. testified similarly at trial about this incident.

[5] R.P. testified similarly at trial about this incident.

letter, defendant referred to a lady with long hair in the Burlington department store advertisement who reminded him of S.A., the one who got away. He also wrote that he might take a look at the phone book that night " 'just for old times['] sake,' " ending the sentence with a " 'smiley face.' " In the past, defendant had told Almeda he clipped pictures of young women out of phone books and fantasized about raping them.

## D

### *Prior Acts Evidence from Victims and Percipient Witness*

J.T. was in the Army stationed in Germany from 1982 to 1983 when she was 19 years old. At the time, she had long brown hair. About 9:00 p.m. one night when she was inside the entrance to the gate at the opening to the base, defendant jumped out from behind a building, punched her in the face, and ripped out her hair "very hard." She screamed "over and over," and defendant "took off." Defendant was convicted by court-martial of assault with intent to commit robbery.

K.L. was 21 years old when defendant married her mother. "[A]t some point," defendant was arrested and while in prison, he sent K.L. a letter threatening that if she did not send him pictures of herself in lingerie, he would "conjure up an affair that [they] never had and that he [would] hurt [her] mom with that . . . ." K.L. was very scared and intimidated by the letter, and her husband "sent it to . . . the authorities."

D.M. worked in the canteen in Mule Creek State Prison in 1996. While she was there, defendant gave her a letter and handkerchief that contained "sexual innuendos." The letter said he wanted to be alone with her, and the handkerchief contained drawings of a woman with long hair and two hearts.[6]

## DISCUSSION

## I

### *Sufficient Evidence Supported Both Stalking Convictions*

Defendant contends there was insufficient evidence he stalked either M. or J. As we will explain, he is incorrect.

---

[6] This evidence came in through D.M. and another employee who worked at the prison, V.S., who investigated the incident.

## A

### *Statutory Definitions*

The Legislature has defined the crime of stalking as follows: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family . . . ." (Pen. Code,[7] § 646.9, subd. (a).)

" '[H]arasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).)

" '[C]ourse of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 646.9, subd. (f).)

" '[C]redible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. The present incarceration of a person making the threat shall not be a bar to prosecution under this section. Constitutionally protected activity is not included within the meaning of 'credible threat.' " (§ 646.9, subd. (g).)

## B

### *Standard of Review*

"The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] ' "[I]f the verdict

---

[7] All further statutory references are to the Penal Code unless otherwise indicated.

is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' [Citation.] 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the [finder of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [finder of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." ' " (*People v. Snow* (2003) 30 Cal.4th 43, 66 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

## C

### *There Was Sufficient Evidence Defendant Stalked M.*

Defendant argues there was insufficient evidence of all three elements of stalking, namely: (1) following or harassing another person; (2) making a credible threat; and (3) intending to place the victim in reasonable fear for her safety. We take each element in turn, finding sufficient evidence supported all three.

■ The first element of stalking is "willfully, maliciously, and repeatedly follow[ing] or willfully and maliciously harass[ing] another person." (§ 646.9, subd. (a).) Here, there was sufficient evidence to support this element. After M. told defendant firmly she was not interested in him, he got mad. The next day after she had taken a much later lunch hour than normal, defendant left a note calling her derogatory names. The day after this note, defendant positioned himself in his car with a good view of the employee entrance. From this evidence, a reasonable jury could have found defendant purposefully (i.e., willfully) followed M. on more than one occasion (i.e., repeatedly) with the intent to disturb or annoy her (maliciously) after she told him she was not interested in him and refused to acquiesce in his requests to go out with him.[8]

T: ˄ second element is "mak[ing] a credible threat," which includes a threat imp: d by a pattern of conduct or a combination of verbal and written com. unicated statements and conduct. (§ 646.9, subds. (a), (g).) Here, defei 'ant's pattern of conduct, his written notes, and verbal statements impl: l he was going to do whatever it took to get M. to go out with him, reaso ably causing M. to fear for her safety. Almost every workday for

---

[8] T: e jury was instructed that "willfully" means doing an act "willingly or on purpose." "[M]a ʌiously" means "intentionally" doing "a wrongful act" or "act[ing] with the unlawful intent ʌo disturb, annoy or injure someone else." And "[r]epeatedly means more than once."

approximately seven months, defendant followed M. and/or placed notes on her car. He would always find her or her car no matter what time she had taken her lunch hour or in what location she had parked her car. When she told him firmly she was not interested in him, he got mad. The next day, defendant tracked her car down yet again, left her a note stating he did not like to keep leaving notes on her car, she was an "immature trouble making brat" and asking, "Now what" and what he had to do to get a call from a beautiful woman. When M. read this note, she "really freaked out," "starting parking way down the road" so defendant would not see her car and had people walk her to her car. The next day, he returned again and positioned himself with a good view of the employee entrance. From this evidence, a reasonable jury could have found that defendant made an implied threat to her safety in that he was going to do whatever he needed to get M. to go out with him and that she reasonably feared for her safety. His persistence lasted seven months with no signs of abating, his last conversation with M. and his last note to her evidenced hostility toward her, and his final action of positioning himself where he could see her comings and goings at work signaled he was not going to take no for an answer.

The third element of stalking is intending to place the victim in reasonable fear for his or her safety. Here, defendant's intent was evidenced by comments in two notes he left for M. explicitly alerting her he had been tracking her. The first was when he mentioned her new car within the first week she purchased it. The second was when he mentioned she had "funny lunch hours." From these comments, a reasonable jury could conclude defendant wanted M. to know he had been watching her while she was parked at work and keeping track of her schedule to place her in fear of her safety.

Taken as a whole, therefore, there was sufficient evidence to support the jury's verdict that defendant stalked M. within the meaning of section 646.9.

### D

*There Was Sufficient Evidence Defendant Stalked J.*

Defendant makes a similar sufficiency-of-the-evidence argument with respect to J., challenging all three elements of the crime. Again, we find sufficient evidence to support the stalking conviction.

As to the first element, there was no evidence defendant followed J., so we focus on the evidence he harassed her within the meaning of the statute. Defendant called J. under the guise of searching for a "livable shack in the boonies for less than 60,000 dollars." It was apparent defendant's contact with J. was not directed toward the legitimate purpose of buying real estate,

as he refused her request to provide her information to help him qualify for a loan, would not give her the correct spelling of his name, and would not tell her the truth about how he got her contact information. When she tried to cut off contact with him, defendant kept calling her, leaving her one irate message about realtors dropping customers and another message that he wanted to "finish this with [her]" and wanted her to "handle [his] issues." Defendant left her feeling afraid and trapped. This evidence was sufficient to support the element of harassment.

The second element is making a credible threat. Here, defendant's pattern of conduct in calling J. over 30 times in three weeks despite her desire to cut off contact with him, and his verbal statements in those calls, implied a threat that caused her to reasonably fear for her safety. He left messages for J. that were "a little too comfortable and playful," ones that left her with a "haunting and violating feeling," and ones that scared her. He told her he wanted a house in the boonies and then hinted she should take him out in her car to look at the properties. He told J. that she had a "really cool voice" and he could " '[p]robably talk to [her] all day.' " He left a message saying he had something to tell her, laughed, and then told her if she was curious enough, she would call back. When she did not, he asked her if she liked surprises. He left a message saying he wanted to come by the office. She changed her parking habits and dress to hide from defendant and would not hold open houses. When she did not return this call, he left her an irate message about realtors dropping their clients. When she told him that she was quitting the residential real estate market, he still persisted in calling her. In his last messages, he cryptically told her he wanted to "finish this with [her]," wanted her to "handle [his] issues," and he wanted "out of Dodge and by now, [she] probably kn[e]w why." It was after this series of calls that J. contacted law enforcement.

Taken as a whole, this conduct implied a threat to J.'s safety. She knew defendant is a sex offender and defendant's last comment to J. indicated he knew that she knew.[9] He intimated he wanted to be alone with her, made suggestive comments about her voice, asked if she liked surprises, told her he wanted to come by the office, was irate when she tried to get rid of him, and left cryptic messages on her answering machine. Simply put, this pattern of unrelenting conduct over the course of three weeks that toward the end became hostile and demanding, perpetrated by someone who is a sex offender and had no legitimate interest in real estate, was sufficient to satisfy this element.

---

[9] The evidence supports this inference because of defendant's comment to J. that she probably knew why he wanted "out of Dodge."

In part III of the Discussion we explain why the court did not err in admitting evidence defendant was a registered sex offender.

■ The third element is intending to place the victim in reasonable fear for his or her safety. Here, it can be inferred defendant intended to place J. in reasonable fear for her safety from his persistent phone contacts with her despite her attempts to end them, his apparent knowledge that she knew he is a registered sex offender, and his hostile and demanding tone in one of his last messages. This evidence supported not only the conclusion J. reasonably feared defendant and had reason to fear him but also that he acted with the intent to induce that fear. (*People v. Falck* (1997) 52 Cal.App.4th 287, 299 [60 Cal.Rptr.2d 624].)

II

*Defendant Has Not Established the Court Prejudicially Erred in Admitting Specific Witness Testimony Regarding Defendant's Prior Bad Acts*

The court admitted evidence of defendant's prior bad acts to show intent, motive, and common plan or scheme. Defendant contends the court erred and denied him a fair trial by allowing numerous witnesses (V.S., D.M., K.L., J.T., K.G., S.A. and R.P.) to testify about defendant's prior bad acts, because the acts were "not even close to being similar to the [current] matters." In his argument, defendant makes a point of noting he is not challenging the testimony of cellmate Almeda.

Defendant has not carried his burden to prove prejudicial error. The problem with defendant's argument is that even if we were to agree with him the court erred in admitting testimony of the seven witnesses he has singled out, the evidence still included Almeda's damaging testimony. In defendant's discussion of prejudice, he makes a generalized claim about the nature of stalking cases being a "media cause" and about the introduction of his prior acts turning the case into a trial of his past. But defendant fails to explain why, even if the jury had not been presented with the testimony of the seven witnesses he claims should not have been introduced, he would have received a more favorable result at trial given Almeda's testimony that covered most and the worst of defendant's bad acts. This is his burden, and he has failed to carry it. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

III

*The Court Did Not Err in Admitting Evidence Defendant Is a Registered Sex Offender*

Defendant contends the court erred and denied him a fair trial when it admitted into evidence that he was listed on Megan's Law database as a sex

offender. The court admitted the evidence to show that defendant made a credible threat toward J. with the intent to place J. in reasonable fear, insofar as he knew that she knew he is a sex offender. We find no abuse of discretion.

■ All relevant evidence is admissible unless prohibited by statute. (Evid. Code, § 351.) "Relevant evidence" includes evidence having "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) The trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (*Id.*, § 352.) The trial court's discretionary decision to admit evidence " 'will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice.' " (*People v. Cain* (1995) 10 Cal.4th 1, 33 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

Measured against these standards of admissibility, we find no error in the admission of defendant's status as a sex offender registrant. One fact of consequence in this case was whether defendant's conduct toward J. rose to the level of a credible threat to her safety. (§ 646.9, subds. (a), (g).) The credible threat was the link between defendant's intent to place J. in reasonable fear of her safety and the reasonable fear, if any, that J. felt. (*Ibid.*) J.'s knowledge that defendant is a registered sex offender would tend to prove that J.'s fear of defendant was reasonable. This is because it is rational that J. would interpret defendant's pattern of conduct and his verbal statements in a different light when she knew he is a sex offender.[10]

While usually the prejudice flowing from evidence disclosing that the defendant is a registered sex offender is high, such would not have been the case here. The jury had much more damaging evidence before it regarding the details of sex offenses defendant had perpetrated on numerous women in the past. On this record, the prejudicial value of defendant's status as a sex

---

[10] Defendant argues that evidence he is a sex offender registrant could not be used to prove the credible threat because J. learned that information on her own. As defendant puts it, "threat needs to produce the fear." Defendant's argument ignores that "in determining whether a threat occurred, the entire factual context, including the surrounding events and the reaction of the listeners, must be considered." (*People v. Falck, supra*, 52 Cal.App.4th at p. 298.) We therefore cannot ignore what a victim knows about a defendant, regardless of how it is learned, in assessing whether a defendant's behavior rises to the level of a credible threat. This, however, does not mean that innocuous behavior will somehow morph into the crime of stalking simply because of a victim's knowledge of a defendant's sex offender status. Defendant's intent to place the victim in fear is still a necessary element of the crime.

offender registrant was low and the probative value was high. The court therefore did not err in admitting the evidence.[11]

## IV

### *The Trial Court Did Not Abuse Its Discretion in Failing to Dismiss Defendant's Strikes*

Defendant contends the trial court abused its discretion in refusing to dismiss a "sufficient [number of] strikes . . . to avoid 25 years to life terms for nonviolent stalking offenses." We disagree.

While the trial court has the power to dismiss a strike conviction (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529–530 [53 Cal.Rptr.2d 789, 917 P.2d 628]), an appellate court will not disturb the trial court's ruling denying a defendant's request to dismiss his strike conviction absent an affirmative showing of an abuse of discretion. (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 434–435 [70 Cal.Rptr.2d 462].)

Here there was no abuse, given defendant's criminal history that the court relied on when denying defendant's *Romero* motion. According to the trial testimony and the probation report, defendant had at the very least a criminal record that included the following: a court-martial conviction for assaulting a female soldier with the intent to commit robbery; convictions for attempted kidnapping for the incident where he impersonated an undercover police officer and assaulted S.A.; and convictions for forcible rape, forcible sodomy, forcible lewd acts on a child, and kidnapping resulting in a 29-year prison sentence for the incident where he lured R.P. to his trailer under the guise of seeking babysitting services. When he was released from prison after serving time on that sentence, he twice violated his parole—once in 2005 and again in 2006. He was still on parole when he committed the instant crimes. On this record, the court had a reasonable basis for not exercising its discretion to dismiss defendant's strikes.

---

[11] Given our conclusion, we also reject defendant's constitutional claim. Application of the ordinary rules of evidence does not infringe on a defendant's constitutional rights. (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

## V

### *Defendant's Sentence Is Not Cruel and/or Unusual Punishment*

Defendant contends, as he did below, his sentence of 50 years to life in prison constitutes cruel and/or unusual punishment under the United States and California Constitutions.[12] We reject these claims.

### A

### *California Constitution*

■ "[I]n California a punishment may violate [California Constitution, article I, section 17] if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) We consider three areas of focus for assessing disproportionality: (1) an examination of the nature of the offense and the offender; (2) a comparison of the sentence with punishments for different offenses in the same jurisdiction; and (3) a comparison of the sentence with punishments for the same offense in other jurisdictions. (*Id.* at pp. 425–427.)

Turning to the first area of focus, "[i]n examining 'the nature of the offense and the offender,' we must consider not only the offense as defined by the Legislature but also 'the facts of the crime in question' (including its motive, its manner of commission, the extent of the defendant's involvement, and the consequences of his acts); we must also consider the defendant's individual culpability in light of his age, prior criminality, personal characteristics, and state of mind." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 806 [64 Cal.Rptr.2d 236].)

Defendant began committing crimes right after he enlisted in the Army while he was still a teenager and has a lengthy record as a habitual violent criminal offender, which we already have recounted. While defendant minimizes the nature of his current offenses by characterizing the "resultant overall effect" as simply "bother[ing] and annoy[ing] the two women somewhat," the evidence shows otherwise. As a result of defendant's conduct, M. bought Mace, "freaked out," changed parking locations multiple times, stopped going out at night, had people walk her to her car, and had her girlfriend spend the

---

[12] The People incorrectly contend that defendant did not raise this claim under the California Constitution.

night at her house. J. became afraid and felt trapped, would not hold open houses, changed parking locations, and changed her appearance. We find nothing in these facts or in defendant's background that would compel the conclusion that defendant's sentence is grossly disproportionate to the crimes he has committed sufficient to shock the conscience and offend notions of human dignity. (*In re Lynch, supra*, 8 Cal.3d at p. 424.)

With respect to the second area of focus—a comparison of the challenged penalty with punishments for different offenses committed in the same jurisdiction (*In re Lynch, supra*, 8 Cal.3d at p. 426)—defendant notes that stalking is a "wobbler offense" and compares the lengthy sentence he received to the punishment for "rape, robbery, voluntary manslaughter, assault with a machine gun, carjacking, or burglary."

Defendant's argument "is inapposite since it is [defendant's] recidivism in combination with his current crimes that places him under the three strikes law." (*People v. Ayon* (1996) 46 Cal.App.4th 385, 400 [53 Cal.Rptr.2d 853], disapproved on another ground in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10 [76 Cal.Rptr.2d 255, 957 P.2d 945].)

■ With respect to the third area of focus—a comparison of the punishment imposed with sentences for more serious crimes and the punishments imposed for the same offense in other jurisdictions (*In re Lynch, supra*, 8 Cal.3d at p. 427)—defendant notes that "[s]talking in California . . . has lower requirements than similar crimes in other states, not being limited to violent type offenses." Simply because California's law might be among the harshest, does not make it unconstitutional. "Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516 [84 Cal.Rptr.2d 638].)

In light of our analysis of these factors, defendant's sentence does not violate the California proscription of cruel or unusual punishment.

B

*Federal Constitution*

■ Turning to defendant's claim based on federal law, the Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, but strict proportionality between crime and punishment is not required. " 'Rather, [the Eighth Amendment] forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1135 [46 Cal.Rptr.2d 351].)

■ The Supreme Court of the United States has upheld statutory schemes that result in life imprisonment for recidivists upon a third conviction for a nonviolent felony in the face of challenges that such sentences violate the federal constitutional prohibition against cruel and unusual punishment. (See *Ewing v. California* (2003) 538 U.S. 11 [155 L.Ed.2d 108, 123 S.Ct. 1179] [25-year-to-life sentence under three strikes law for theft of three golf clubs worth $399 each]; *Lockyer v. Andrade* (2003) 538 U.S. 63 [155 L.Ed.2d 144, 123 S.Ct. 1166] [two consecutive terms of 25 years to life for two separate thefts of less than $150 worth of videotapes].)

In the present case, as we discussed in connection with his California constitutional claim, defendant's sentence is not grossly disproportionate to the crimes and recidivism for which he is being punished. As a result, his Eighth Amendment claim fails as well.

## DISPOSITION

The judgment is affirmed.

Nicholson, Acting P. J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 15, 2009, S172562. George, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.