Filed 11/9/21  P. v. Lai CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE, | C091679 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2019-0016316) |
| v. | |
| ADRIAN LAI, | |
| Defendant and Appellant. | |

A jury found defendant Adrian Lai guilty of three counts of stalking (Pen. Code § 646.9, subd. (a)).[1]  The trial court sentenced him to four years and four months in state prison, and required defendant to register as a sex offender for his lifetime pursuant to section 290.  Defendant appeals his conviction on the basis that there was not substantial evidence to support the jury's findings that he was guilty of stalking.  Defendant also appeals the requirement that he register as a sex offender for life on the basis that the trial

---

[1]  Undesignated statutory references are to the Penal Code.

court erred by not considering the nature of the offenses, and that it misapplied the law and evidence concerning his current risk of sexual or violent re-offense. Finding no error, we affirm.

BACKGROUND

Defendant was convicted of stalking three different women.

*A.W.*

In April 2019, A.W. was at a gas station and was approximately seven months pregnant. She was pumping gas when defendant drove up to her and asked if she was single. A.W. laughed and said no, after which defendant drove away.

The next month, A.W. was at a Wal-Mart at approximately 9:00 p.m. when she turned around and saw defendant a few feet away. He again asked if she was single, to which she responded, "Didn't we already have this conversation?" Defendant indicated no, to which A.W. stated she was not single. About 15 minutes later, while checking out of the store, A.W. again noticed defendant this time staring at her with a "blank stare." As she was with her two sisters and her two-year-old son, she went to her car and got in, at which time she realized defendant was "parked in backwards, staring at me with his headlights." A.W. was very fearful as she was so pregnant and could not defend her sisters or her son if she needed to. She was afraid defendant would follow her home as she lived by herself.

A.W. drove to a gas station upon leaving Wal-Mart and began pumping gas. About two minutes later defendant drove into the gas station. Defendant drove around A.W.'s car four times, and when she asked him, "[w]hy are you following me?" he responded that he was not following her. Defendant then drove into the carwash where he remained for about 30 to 45 minutes. A.W. "panic[ked]" and called her stepfather, who then drove to the gas station.

Upon leaving the carwash, defendant drove around the gas station and parked in a stall for about 20 minutes. Defendant then came up to A.W., during which time her sister

2

began recording him. Defendant questioned why they were filming him, to which A.W. responded, "why are you following me?" Defendant asserted that he was not following her, and then returned to his car. A.W.'s stepfather stood by her car, at which point defendant left the gas station in his car, staring at A.W. and her stepfather as he drove away. A.W. was very afraid as she drove home because it was late and dark and she couldn't be sure defendant was not still following her.

On the Fourth of July, A.W. again saw defendant when she was at her father's house. She was on the front porch when she saw defendant drive by twice, make eye contact with her, and drive off. A.W. started screaming and told her father that she had just seen defendant. After this incident, A.W. did not return to her father's house because she was afraid she would see defendant again.

*Y.S.*

Y.S. saw defendant at her workplace in June or July 2019. She was walking, and defendant approached her in his car and asked if she was single and if she wanted to go out with him. Y.S. responded that she was not interested and asked defendant to leave her alone. Y.S. recognized defendant from a number of years prior when he approached her and several other women to tell them that they were cute.

About once a week or every two weeks Y.S. would see defendant driving around the parking lot at her workplace. Every time he would ask her the same questions, and she would ask him to leave her alone.

Subsequent to June or July 2019, Y.S. noticed that defendant was following her as she was on her way to Starbucks. She took a picture of his car, at which time he "got very upset." He followed her into Starbucks and confronted her. He asked her why she was taking pictures of him and if she knew him. Y.S. told him to leave her alone. After this incident, Y.S. did not see defendant again. She estimates he made contact with her about six times.

3

Y.S. felt afraid during her contacts with defendant. She worried that he was going to hurt her or hurt someone else. When defendant followed Y.S. into Starbucks she felt worried because he was bold enough to follow her into a business.

*J.R.*

In June or July 2019, defendant approached J.R. while she was returning to her job from lunch. Defendant was in his vehicle and stopped J.R. as she was walking and asked her if she had a husband, to which J.R. responded, "no" and walked into her building.

Shortly after the first incident, defendant again approached J.R. as she was returning to work from lunch and asked her if she was married. J.R. responded that he had already asked her this question and walked back into her building.

The third time defendant approached J.R. she was sitting in her vehicle in the parking lot outside her job. Defendant pulled into the parking space next to J.R.'s car, got out of his car, and started knocking on the passenger window of J.R.'s car. Realizing it was defendant, J.R. faced forward and did not respond. Defendant then walked around the front side of J.R.'s car to her driver's side door. Defendant pounded on J.R.'s driver's side window and said, "I'm talking to you, I'm talking to you."

J.R. rolled down her window a small amount and asked why defendant was bothering her, to which he responded, "I want to know if you're married." J.R. stated, "You've been asking me this multiple times," and "You're scaring me." Defendant repeated, "Well, are you married"? J.R. responded, "Yes, I'm married" in an effort to get defendant to leave her alone. Defendant continued to knock on the window as J.R. rolled it back up. J.R. believed defendant was not going to take no for an answer, and felt his demeanor changed to aggressive and irritated at her for rolling up her window. Eventually, defendant got into his vehicle, at which point J.R. started her car and pulled out of the parking space, after which defendant drove off.

The first time defendant approached her, J.R. "didn't think anything of it." The second time he approached her she felt "awkward." The third time, she was scared

4

because he had continued to approach her at the same time in the same location and she did not understand why he continued to bother her.

J.R. saw defendant a fourth time, in August 2019 while driving home from work. She glanced in her rear-view mirror and noticed defendant was in the car right behind her. She noticed defendant looking directly forward, at her. At that point she made a quick exit and was able to lose defendant in traffic. This incident made J.R. nervous and fearful.

The court sentenced defendant to four years and four months in state prison and ordered defendant to register as a sex offender for life pursuant to section 290.

DISCUSSION

*The Stalking Convictions*

Defendant contends his right to due process was violated because there is insufficient evidence to support the jury's determination that he threatened the women. Defendant also argues the evidence does not support a finding that he intended to place the women in fear for their safety.

Section 646.9, subdivision (a) provides, "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . ." Thus, the three elements of stalking are: (1) following or harassing another person; (2) making a credible threat, which includes a threat implied by a pattern of conduct or a combination of verbal and written communicated statements and conduct; and (3) intending to place the victim in reasonable fear for his or her safety. (*People v. Uecker* (2009) 172 Cal.App.4th 583, 594-595 (*Uecker*).)

In *Uecker*, the defendant's statements, written communication, and pattern of conduct constituted a "credible threat" by indicating "he was going to do whatever it took to get [the victim] to go out with him, reasonably causing [her] to fear for her safety."

5

(*Uecker, supra*, 172 Cal.App.4th at p. 594.) The defendant followed and placed notes on the victim's car almost every workday for seven months. (*Id.* at pp. 594-595.) When she said she was not interested in him, he got mad. (*Id.* at p. 595.) He even positioned himself in front of the employee entrance so he could watch for the victim to leave. (*Ibid.*) This all provided substantial evidence for the jury's determination that the defendant made threats against the victim as he was persistent, he evidenced hostility toward her, and he indicated through his conduct that he was not going to take no for an answer. (*Ibid.*)

In *People v. Lopez*, the defendant's conduct demonstrated he was obsessed with the victim, contacting her repeatedly over many years, despite her efforts to stop him. (*People v. Lopez* (2015) 240 Cal.App.4th 436, 452 (*Lopez*).) When the victim stopped responding to him, he sent packages to her mother's house once or twice a year for five or six years. (*Ibid.*) The defendant sent the victim a birthday card with a fresh flower and multiple messages on Facebook. (*Ibid.*) After being contacted by the police, the defendant sent the victim another package and appeared as she was walking home from a friend's house. (*Id.* at p. 453.) She continued to tell him that he was scaring her, and yet he continued his behavior. (*Id.* at p. 452-453.)

While the defendant in *Lopez* did not make overt threats, his course of conduct constituted a credible threat. (*Lopez, supra*, 240 Cal.App.4th at p. 453.) The defendant's overall conduct, including his persistence and obsession, was something a reasonable person would understand as threatening. (*Ibid.*) The defendant's conduct also demonstrated that he often knew where the victim was and that he remained close by. (*Ibid.*)

"In considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable

6

doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

The totality of the evidence presented at trial supports the jury's conclusion that defendant made a credible threat sufficient to constitute stalking in all three counts by implying he would do whatever it took to get the victims to go out with him. While defendant never overtly threatened any of the victims, he persistently followed and harassed them, despite their repeated requests to be left alone. Defendant followed A.W. to a gas station, a Wal-Mart, a second gas station, and appeared outside her father's home. All of this, despite the fact that A.W. was a stranger to him, and repeatedly told him that she did not want to go on a date with him. Defendant followed A.W. even after she asked her stepfather to come protect her at a gas station. All of this behavior made A.W. afraid of what defendant would do to her, or her family members.

Defendant found Y.S. at her workplace, after having approached her many years prior. Defendant repeatedly appeared in the parking lot of Y.S.'s workplace, repeatedly asking her if she wanted to go out with him, and each time Y.S. would decline and ask him to leave her alone. Again, all of this behavior occurred despite Y.S. being a stranger to defendant. When defendant followed Y.S. to a Starbucks, he angrily confronted her inside the Starbucks, in front of other people. Y.S. felt afraid of defendant, who clearly knew where she worked and was not afraid to accost her in a public place.

Defendant also approached J.R. outside of her work, always asking her if she was married. Defendant's behavior then escalated to pounding on the window of J.R.'s vehicle, making it clear he would not leave until she rolled it down and spoke to him. Again, this occurred even though J.R. was a stranger to defendant. J.R. believed

7

defendant would not take no for an answer, and felt he was behaving in an aggressive manner.

As in *Lopez* and *Uecker*, defendant did not make overt threats, however his pattern of conduct indicated he was intent on continuing to follow and question A.W., Y.S., and J.R. despite their repeated requests to be left alone. His behavior always escalated, whether following Y.S. into Starbucks and confronting her, pounding on the window of J.R.'s car, or showing up outside of the home of A.W.'s father. The women all reported that they felt afraid and worried that defendant was going to take more extreme and dangerous action. Viewing the record in the light most favorable to the judgment, substantial evidence supports the finding that defendant threatened A.W., Y.S., and J.R.

Defendant further argues he did not intend to place the women in fear for their safety and consequently could not be found guilty of stalking. However, there is a point at which behavior that evokes discomfort or anxiety can reasonably be regarded by someone of normal sensibilities as threatening behavior, intended to place the person in fear of harm. Defendant was not merely attempting to date or inquire about romantic interest; he defied the women's requests to be left alone and continued showing up in circumstances that clearly placed them in distress. Defendant's measures of repeatedly following and asking about marital statuses for these women despite such distress were not those of an eccentric paramour but of a predator intent on demonstrating his power to upset his victims. While defendant may have not intended to cause the women distress on the first instance, it is obvious that his repeated intrusions were unwelcome and unwanted. Viewing the record in the light most favorable to the judgment, substantial evidence supports the finding that defendant intended to place the victims in reasonable fear for their safety.

Because the stalking convictions are supported by substantial evidence, the convictions do not violate defendant's rights to due process and a fair trial.

8

*Section 290 Registration*

Defendant does not challenge the trial court's determination that he should register as a sex offender pursuant to section 290. Instead, he argues the trial court erred in determining he must register for life pursuant to the tier scheme set out in section 290.006.

The People argue that although the trial court evaluated defendant's registration status pursuant to the tiered scheme, this scheme was the result of a statutory revision that did not take effect until after his sentencing. Accordingly, the People argue the only option available to the court at sentencing was to require defendant to register as a sex offender for life. The People assert defendant is entitled to reevaluation pursuant to the new law, but that such review is to be completed by the Department of Justice.

Section 290.006, subdivision (a) provides that a court has discretion to order a person to register as a sex offender if it finds at sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification. Prior to January 1, 2021, and at the time of defendant's sentencing in March 2020, section 290.006, in conjunction with section 290, did not provide for anything less than lifetime registration. Under this scheme, the court did not have discretion to impose registration for less than lifetime. (*People v. Eastman* (2018) 26 Cal.App.5th 638, 647, fn. 9.) Effective January 1, 2021, the statutory scheme was amended to provide for three tiers, of ten years, twenty years, and lifetime registration. (Sen. Bill. No. 145 (2019-2020 Reg. Sess.); § 290.006.)

Here, the trial court did not have discretion at the time of sentencing to require defendant to register for any period less than his lifetime. Although the trial court erroneously referred to the three-tier scheme, we need not alter the judgment as the outcome is correct. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [a ruling correct in law will not be disturbed merely because given for a wrong reason].) As the People point out, section 290, subdivision (d)(5) provides that the Department of Justice shall place a

9

person previously sentenced in the appropriate tier category. Further, as the three-tier scheme was not in effect at the time of sentencing, we do not address defendant's arguments that the trial court erred in its consideration of factors pursuant to the new scheme.

DISPOSITION

The judgment is affirmed.

_____/s/_____

RAYE, P. J.

We concur:

_____/s/_____

HULL, J.

_____/s/_____

RENNER, J.