Filed 5/22/26  P. v. Noguera-Ospino CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WAINER JULIAN NOGUERA-OSPINO,<br><br>    Defendant and Appellant. | A169740<br><br><br>(Contra Costa County<br>Super. Ct. No. 022201256) |

Wainer Julian Noguera-Ospino was convicted of numerous offenses against Jane Doe, including aggravated mayhem, infliction of corporal injury on a dating partner, and stalking, among others.  Noguera-Ospino appeals, contending there was insufficient evidence to support his stalking conviction. We disagree and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The prosecution's case included witness testimony of the following events, all of which took place in 2022 and was provided by Doe unless otherwise specified.

Noguera-Ospino and Doe began dating in the summer of 2022.  At that time, Noguera-Ospino was unemployed and had no car.

On the night of August 23, Doe drove Noguera-Ospino to a San Rafael care facility where she worked as a caregiver.  Noguera-Ospino said he would

1

sleep in the car while Doe worked.  When they arrived, Noguera-Ospino saw the car of another caregiver in the parking lot and got jealous when he learned that caregiver was a man.  Noguera-Ospino badgered Doe about the male caregiver and would not let her leave even though her shift was about to start.  When Doe tried to exit the car, Noguera-Ospino grabbed her phone, ran off with it, and tried to unlock it.  Doe got her phone back after promising she would unlock it for Noguera-Ospino.  When Noguera-Ospino returned the phone, Doe immediately took it and went in for her shift.

For the next hour, Noguera-Ospino continuously texted and called Doe, despite knowing she had to attend to the residents and could not be on her phone.  In one of Noguera-Ospino's texts, he threatened to knock at the facility's door if Doe did not come out.  At one point, Doe texted to let Noguera-Ospino know she would visit him on her break.  However, an hour into the shift and before her break, Doe was forced to return to the car because Noguera-Ospino would not stop texting.

When Doe went to the car, Noguera-Ospino was agitated and angry, and he accused Doe of ignoring him.  As Doe tried to explain she was not ignoring him but was working, Noguera-Ospino suddenly slapped her very hard across her face.  This shocked Doe, and she began to cry.  When Doe told Noguera-Ospino she had to return to work, Noguera-Ospino would not let her and, instead, forced her to have sex with him.

Doe did not clearly remember what happened afterwards but she knew she wanted to get away from Noguera-Ospino and return to the facility.  Doe subsequently saw Noguera-Ospino start to drive off with her car.  She ran out and asked Noguera-Ospino what he was doing, but he did not respond and drove away.  Doe reported the stolen vehicle to the police.

Doe's colleague testified she noticed Doe was "crying a lot" that night and Doe's face was red with a "mark on it." When asked about what happened, Doe responded her boyfriend or partner had hit her and taken her car from the company parking lot. Doe seemed "really afraid," "hesitant," and "nervous about what had happened."

Doe called and texted Noguera-Ospino all night to ask him to return her car as she needed it to get to her morning shift. When Noguera-Ospino finally responded, he told Doe she could pick up the car near the place he was living. Noguera-Ospino left a voicemail stating he left the care facility because Doe had warned she could call the police, so he was "not going to be stupid to stay there so that obviously they would take me to jail."

Notwithstanding Noguera-Ospino's actions on August 23, Doe decided to continue dating him after he begged for forgiveness. Between the August 23 incident and a subsequent incident on September 20, Doe and Noguera-Ospino were still seeing and having sex with one another. The implication of this particular testimony will be addressed, *post*.

On September 1, Doe and Noguera-Ospino were chatting in the backseat of her car in a waterfront area when Noguera-Ospino suddenly reached over to grab Doe's phone out of her front shirt pocket. After a back-and-forth struggle, Noguera-Ospino obtained Doe's phone and ran out of the car. The following morning, Doe went to her mobile phone store to report her phone stolen and obtained a temporary phone. She asked that her stolen phone be turned off because she did not want Noguera-Ospino to use or sell the phone, which had all her personal information as well as photos of her children. Doe was concerned about this because Noguera-Ospino had told her at the beginning of their relationship he was in a "bad situation" and "needed money," and he was always asking her for money.

After taking Doe's phone, Noguera-Ospino began contacting her, sometimes daily, to demand $1,000 in exchange for her phone. Doe responded the demand was " 'ridiculous,' " and she was " 'not going to give [Noguera-Ospino] money for [her] own property.' " Doe continued to resist Noguera-Ospino's requests for money, but offered to assist him in other ways. Among other things, Doe introduced Noguera-Ospino to a restaurant manager who could help him find employment, paid to help him obtain an identification card, and sent him DoorDash or UberEats meals when he called to tell her he had no money and was hungry.

Doe met with Noguera-Ospino a few times because he told her he would return her phone. Each time, however, Noguera-Ospino would refuse to do so and would instead ask Doe to take him somewhere. Doe continued to see Noguera-Ospino only because she wanted her phone back and was fearful about him having access to her personal information.

At one point, Noguera-Ospino told Doe he pawned her phone and said she would have to give that person $1,000 to get her phone back. Noguera-Ospino also began threatening Doe by telling her that he had connections with the Colombian cartel in San Jose and that these individuals would come after Doe and her children. These threats greatly concerned Doe and made her feel like she had to move.

On September 20, in an effort to get her phone back, Doe told Noguera-Ospino she would give him $1,000 for her phone despite not intending to actually pay him. To that end, she picked Noguera-Ospino up in Richmond and, per his request, took him to a Mexican restaurant in San Pablo because he was hungry. When Doe picked up Noguera-Ospino, he had bags containing his belongings as he had just been kicked out of the house where he was staying.

4

Upon arriving at the restaurant, Noguera-Ospino said he was not hungry anymore and asked Doe to take him somewhere so he could have sex with her. Doe refused and when she failed to give Noguera-Ospino money after he returned her phone, he became increasingly "worked up" and "furious." Given the incident that occurred in August, Doe became scared, got out of the car, and began walking towards the restaurant. Noguera-Ospino exited the car and grabbed her by both arms to keep her from getting away. He then bit a chunk out of her eyebrow, which he spat out on the ground before leaving. Video surveillance captured the moment Noguera-Ospino bit Doe. At that point, restaurant employees ran out to assist Doe, who was covered in blood, and called 911 for her. Doe was taken by an ambulance to the hospital where she received stitches.

Noguera-Ospino took the stand and testified. Among other things, he said he called Doe only twice from her car on August 23 and was just "playing" when he ran off with Doe's phone. After hearing Doe confess to something that made him feel uncomfortable, he asked Doe to call an Uber for him. When Doe refused, he drove away with her car and left her a voicemail. Noguera-Ospino denied hitting Doe in the face or raping her that night.

Doe kept calling Noguera-Ospino after the August 23 incident, and they continued to communicate and spend time with each other between August 23 and September 20. Noguera-Ospino never told Doe he had connections with the Colombian cartel. He denied telling Doe he pawned her phone and claimed he returned her phone before the September 20 eyebrow-biting incident.

Noguera-Ospino testified that the four days preceding September 20 had been difficult because he was kicked out of his place. Noguera-Ospino

5

asked Doe to "help [him] out" because he had no place to live and had not eaten or slept for four days. Doe gave him $100 and told him she would give him more the following day. Doe then began to insult him. When they got out of the car, Noguera-Ospino tried to calm Doe down because she was very agitated. He wrapped his arms around her and said " 'Love, calm down. Let me have a kiss. Calm down.' "

Noguera-Ospino did not recall biting Doe and said it all "happened so fast." All he remembered was that Doe was suddenly screaming on the ground, at which point he ran off because he was scared.

The jury found Noguera-Ospino guilty of aggravated mayhem (Pen. Code, § 205; count 1; all unlabeled statutory references are to this code); infliction of corporal injury on a dating partner (§ 273.5, subd. (a); counts 2 and 7); false imprisonment by violence (§§ 236, 237; count 3); stalking (§ 646.9, subd. (a); count 4); and second degree robbery (§ 211; count 5). The jury also found true two great bodily injury allegations.

Noguera-Ospino was sentenced to six years and eight months in prison.

### DISCUSSION

Noguera-Ospino argues his stalking conviction must be reversed because the evidence was insufficient to prove he willfully and maliciously harassed Doe as required by section 646.9. We are not persuaded.

In assessing whether a conviction is supported by sufficient evidence, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We review " 'the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118 (*Jurado*).) In doing so, we may not reweigh the evidence or

reevaluate a witness's credibility. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) Instead, we presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Davis* (1995) 10 Cal.4th 463, 509 (*Davis*).) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278 (*Ghobrial*).)

"Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for their safety, or the safety of their immediate family, is guilty of the crime of stalking." (§ 646.9, subd. (a).) The term "harassment" is defined as "engag[ing] in a knowing and willful course of conduct" that "seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) A "course of conduct" means "two or more acts occurring over a period of time" that "evidenc[e] a continuity of purpose." (§ 646.9, subd. (f).)

Here, there was substantial evidence showing that Noguera-Ospino willfully and maliciously engaged in two or more acts that seriously alarmed, annoyed, tormented, or terrorized Doe and that served no legitimate purpose. Doe testified that after Noguera-Ospino took her phone on September 1, he began demanding $1,000 in exchange for her phone. At one point, Noguera-Ospino was calling Doe "every day" to make his demands. At another point, Noguera-Ospino told Doe he had pawned her phone and demanded she give that person $1,000 to get her phone back. Noguera-Ospino also lured Doe into meeting up with him a "few" times based on promises he would return her phone. When Doe showed up, however, Noguera-Ospino would keep the

7

phone and try to make Doe take him somewhere. This evidence was sufficient to prove Noguera-Ospino acted willfully and maliciously in making two or more demands for Doe to pay $1,000 for the return of her own phone, without any legitimate purpose.

There was also ample evidence that Noguera-Ospino's conduct seriously alarmed, annoyed, tormented, or terrorized Doe. He repeatedly demanded a ransom for Doe's phone, and threatened her by claiming he had connections with a Colombian cartel in San Jose whose members would come after Doe and her children. These threats greatly concerned Doe and made her feel like she had to move. Moreover, the combination of Noguera-Ospino's economic circumstances and his continued, wrongful retention of Doe's phone seriously alarmed Doe and caused her to fear what he would do with all the personal information stored on her phone.[1]

In urging a reversal, Noguera-Ospino focuses on the prosecution's supposed failure to introduce any evidence that his contact with Doe was unwanted. Put another way, he apparently views the prosecution's evidence as showing their contacts were completely consensual. In support, he points to the evidence that Doe continued to see him—i.e., picking him up, bringing him meals, arranging opportunities to meet him for sex, and providing other forms of assistance—as indicating his contact with Doe was not unwanted. As he sees it, the fact that he "periodically threatened [Doe] during or in between these consensual meetings" did not convert his conduct into stalking.

Noguera-Ospino's contention is flawed and unpersuasive. Among other things, the record fails to support his framing of Doe's post-September 1 interactions with him as completely consensual. For one thing, Doe testified

---

[1]     We note Noguera-Ospino's appeal does not challenge the seriousness or rationality of Doe's fear.

8

that any opportunity she took to meet Noguera-Ospino after September 1 was solely for the purpose of retrieving her phone; there was nothing in her testimony suggesting she wanted to meet him for sex. Moreover, her testimony about having had consensual sex with him "[b]etween August 23rd and September 20th" could reasonably have been understood to refer to the time period after August 23 (following their make up after he stole her car) but before he stole her phone on September 1.

To be sure, Doe saw Noguera-Ospino a few times after September 1 and, in response to his repeated requests for money, tried to assist him in various ways. But the jury considered such evidence against the larger backdrop of Noguera-Ospino's persistent demands that Doe give him $1,000 in return for her phone, his threats regarding his cartel connections, and Doe's fears about what Noguera-Ospino would do with the personal information on her phone as long as he had it. On this record, the jury could rationally find beyond a reasonable doubt that Noguera-Ospino willfully and maliciously harassed Doe and made a credible threat with the intent to place her in reasonable fear for her and her family's safety. (See *Jurado*, *supra*, 38 Cal.4th at p. 118.) The jury could also reasonably conclude that Doe testified credibly when she indicated she continued to see him in order to get her phone and its contents back. (See *Ghobrial*, *supra*, 5 Cal.5th at p. 278 [reversal of judgment unwarranted if evidence reasonably justified trier of fact's findings]; *Davis*, *supra*, 10 Cal.4th at p. 509 [reviewing court presumes in support of judgment the existence of every fact that can be reasonably deduced from the evidence].)

Moreover, even if the evidence reflected that Doe and Noguera-Ospino had some consensual interactions in between his threats to her, none of Noguera-Ospino's cited cases suggests he should be shielded from criminal

9

liability based on the record here.  Indeed, none purports to address whether or to what extent evidence of consensual contact compels reversal of a stalking conviction when substantial evidence otherwise establishes that the defendant willfully and maliciously harassed the victim.  (E.g., *People v. Frias* (2024) 98 Cal.App.5th 999; *People v. Lopez* (2015) 240 Cal.App.4th 436; *People v. Uecker* (2009) 172 Cal.App.4th 583; *People v. Halgren* (1996) 52 Cal.App.4th 1223.)

In sum, we find no merit to Noguera-Ospino's contention that his stalking conviction must be reversed because the prosecution failed to present any evidence of unwanted contact after he stole Doe's phone.

### DISPOSITION

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P.J.

_____
Petrou, J.

*People v. Noguera-Ospino*  (A169740)

10