Filed 7/24/13

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C069702 |
| Plaintiff and Respondent, | (Super. Ct. No. 62106498) |
| v. | |
| DONALD JAMES MCPHEETERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Placer County, Mark S. Curry, Judge.  Affirmed as modified.

J. Wilder Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, and IV of the Discussion.

1

A jury convicted defendant Donald James McPheeters of felony stalking in violation of a restraining order (Pen. Code, § 646.9, subd. (b) [count 1]; unless otherwise stated, all statutory references that follow are to the Penal Code), and three counts of disobeying a court order (§ 166, subds. (a)(4), (c)(1) [counts 2 through 4]). The trial court found true an allegation as to count 1 that defendant had a prior conviction for assault with a deadly weapon (§ 245, subd. (a)(1)) within the meaning of sections 667, subdivisions (b) through (i), and 1170.12, subdivisions (a) through (d). The court sentenced defendant to the midterm of three years in state prison for count 1, doubled to six years because of defendant's prior strike. For counts 2 through 4, the court sentenced defendant concurrently to six months each in state prison. The court awarded defendant 175 days of actual credit and 87 days of conduct credit, for a total of 262 days credit.

Defendant contends on appeal that the trial court erred in instructing the jury, that the six-month sentences on the misdemeanor charges should have been stayed pursuant to section 654, and that he is entitled to two-for-two conduct credits under the current section 4019 rather than four-for-two conduct credits under former section 4019, which was in effect when defendant was arrested. We agree the misdemeanor sentences on counts 2 through 4 should have been stayed under section 654. In all other respects, we affirm the judgment.

## FACTS AND PROCEEDINGS

Defendant and the victim, Kathryn C., met in 2003. Although never married, they were in a relationship for approximately five and a half years. They had three children together, one of whom passed away shortly after birth. The couple broke up in 2009 while Kathryn C. was pregnant with their third child.

Defendant has a long and violent criminal history, and in particular a history of committing domestic violence against Kathryn C. Defendant verbally and emotionally abused Kathryn C. on countless occasions and physically abused her three times. In

2

April 2004, defendant and Kathryn C. were watching a fight on television and were rooting for opposing fighters. Kathryn C. playfully teased defendant when her contestant won. Defendant began screaming at Kathryn C. and threw a phone across the room, hitting her in the leg. Defendant was convicted of a misdemeanor domestic violence charge.

In September 2004, Kathryn C. was sitting on a bicycle she and defendant had purchased. After getting into an argument, defendant grabbed Kathryn C.'s wrist and yanked her off the bike. Kathryn C. sustained bruises and scratches to her wrist and ankle. Kathryn C. then went into the house she shared with her mother. Defendant followed, charging towards the screen door and throwing his body against the door to try to force his way into the house.

Defendant began yelling at Kathryn C. for his medication, which was located in her room upstairs. After retrieving defendant's pills, Kathryn C. handed the medicine to her mother. Kathryn C.'s mother placed the pills in a dining room window. Defendant tried to grab Kathryn C.'s mother and pull her through the window. Sometime during the melee, defendant made his way into the house and Kathryn C.'s mother attempted to call 911. After she hung up, the emergency operator called back and Kathryn C. answered the phone. While Kathryn C. was on the phone, defendant pulled the phone plug out of the wall stating he did not want Kathryn C. speaking to the police and that he was not going back to jail. Defendant grabbed a knife and ran upstairs threatening to kill himself. Among other things, defendant was convicted in Placer County of misdemeanor domestic battery.

In June 2005 when defendant and Kathryn C. were living in the state of Washington, defendant became enraged when he could not locate a shaving razor. After screaming at Kathryn C. that she had lost the razor, defendant charged her and threw her on the bed. Defendant shoved his forearm across Kathryn C.'s throat and began choking her for approximately a minute; Kathryn C. could barely breathe. While choking her

3

defendant stated, "I don't want you to breathe." Defendant's mother ran into the bedroom, jumped on defendant's back, and pulled his hair to get him to stop choking Kathryn C. Defendant was convicted of a felony domestic violence-related assault.

No-contact orders were issued in Washington and California protecting Kathryn C. from defendant. Following the choking incident, a Washington court issued a no-contact order in September 2005. In February 2010, the Placer County Superior Court issued a criminal protective order prohibiting defendant from having any contact with Kathryn C. That order was modified in March 2010 to further prohibit defendant from coming within 100 yards of Kathryn C. In August 2010, the Placer County court again modified the protective order requiring defendant to stay at least 60 yards away from Kathryn C., but permitting peaceful contact for the sole purpose of safely exchanging their children during court-ordered supervised visits between defendant and the children at a designated facility known as Parenting Time.

Defendant's violent past terrified Kathryn C., and she was very afraid for herself and her children because defendant continually violated the no-contact orders. She called the police six to 10 times to report defendant's violations. Although he had been arrested and jailed on at least one violation, upon his release defendant immediately contacted Kathryn C. Kathryn C. did not seek any new restraining orders because she believed defendant did not abide by the existing protective orders and she felt the orders did little to keep him away from her.

Between 2005 and 2010, Kathryn C. invited defendant over to her house approximately 15 times despite the no-contact orders so that he could see his son and help her while she was pregnant with their third child. After the birth in April 2010, Kathryn C. stopped inviting defendant over.

Yet defendant continued contacting Kathryn C. On June 19, 2010, defendant showed up unannounced at Kathryn C.'s home accusing her of stealing money from his father. When police later spoke to defendant on the phone about the incident, reminding

4

him of the no-contact restraining order, defendant said he did not care whether the protective order was no-contact or peaceful contact because he intended to continue contacting Kathryn C. and his children regardless of the nature of the order.

On August 10, 2010, defendant had a friend living near Kathryn C. call her to convince Kathryn C. to bring the children over to the friend's house to see defendant. Kathryn C. called police to report a violation of the no-contact order. Defendant was convicted of a misdemeanor for violating the restraining order.

During this time period Kathryn C. started dating another man, David F. They began dating at the end of June 2010 and by August 2010 David F. was living fulltime with Kathryn C. at her house. The three had been mutual friends when Kathryn C. and defendant were together. After Kathryn C. and David F. began dating, defendant was verbally combative and repeatedly tried to pick fights with David F. in front of Kathryn C. or otherwise make him uncomfortable. She believed defendant was jealous of David F. because he perceived him as taking over defendant's family. Around this time, defendant told Kathryn C., "If you don't be careful, something is going to happen to you."

Toward the end of April or beginning of May 2011, defendant moved into a friend's apartment located next door to Kathryn C.'s apartment. After moving in, defendant's contacts with Kathryn C. became more frequent and aggressive. Defendant could see Kathryn C. walking from her residence to the sidewalk through a window in his apartment. He began contacting her two to three times a day--nearly every time Kathryn C. left her apartment. In approximately one month, defendant contacted Kathryn C. between 40 and 50 times.

During this time defendant repeatedly asked Kathryn C. to let him see or take the children. When Kathryn C. told him no and asked him to leave her alone, defendant swore at her and angrily stated, "Somebody needs to beat you up . . . ." On multiple occasions after Kathryn C. pleaded with defendant to stop bothering her, defendant told

5

Kathryn C. that "Somebody is going to kick your butt just like I did this to [certain individuals defendant had hurt in other fights]."

On May 20, 2011, defendant approached Kathryn C. and David F. near the garage of Kathryn C.'s apartment requesting to see the children. David F. told defendant they did not want to speak to him right then and asked him to go away. Defendant replied either, "Oh, talk to me that way, someone is going to end up breaking your jaw for talking to somebody that way," or "You better get the fuck out of here or you're going to get knocked out." [1] After Kathryn C. told David F. she did not feel safe with defendant living next door because he constantly intimidated her, David F. flagged down a passing police officer, Officer Fox, and reported the incident.

Officer Fox located and arrested defendant a short distance away. After being placed under arrest, defendant became irate, cussing at Officer Fox and calling him a "piece of shit." Defendant repeated that the officer was a "piece of shit" and that he was "just as fucked up as the justice system." While in the patrol car, defendant told the officer that the restraining order against him "didn't mean shit, and he was going to be out [of jail] in 20 minutes . . . and he was going to go back to [Kathryn C.'s] house immediately." When the officer responded that he could not contact Kathryn C. due to the restraining order defendant replied, "You can't keep me away. I have proof. There's two warrants for the same thing and the dollar amounts are so low for the warrants that I'll just . . . [get released on his own recognizance] from the jail."

Based on defendant's statements about immediately returning to Kathryn C.'s house upon his release, Officer Fox contacted the on-call judge to raise defendant's bail. When defendant learned of the higher bail, defendant said he did not care and would not

---

**1** David F. testified that defendant made the comment regarding the broken jaw, while Officer Fox testified that David F. told him on the day of the incident that defendant said David F. had "better get the fuck out of here or you're going to get knocked out."

6

show up when his case was called. Defendant also said, "When I get out of here, if I shoot her, there's nothing you can do about it." Defendant repeated the statement when asked by the officer what he had said.

Officer Fox called Kathryn C. and told her what defendant said about shooting her. He asked whether Kathryn C. knew if defendant had a gun. She said she did not know, but that she was very scared. She also informed the officer defendant had told her there was nothing the police could do to keep him away from her.

Defendant was charged with stalking Kathryn C. from June 1, 2010 to May 20, 2011. He was also charged with violating the no-contact orders on June 19 and August 10, 2010 and May 20, 2011. A jury convicted defendant of all charges. Defendant timely appeals.

## DISCUSSION

### I

### *CALCRIM No. 1301*

Defendant contends the trial court erred in instructing the jury on the stalking charge. Defendant's challenge to the given instruction is three-fold.

First, defendant alleges the trial court erred by failing to instruct the jury defendant had to know David F. was a member of Kathryn C.'s immediate family when he threatened David F. in Kathryn C.'s presence.

Second, defendant argues the court failed to instruct the jury that threats made about the victim to a third party could only constitute a credible threat under the statute if defendant intended that those threats be conveyed to the victim.

Third, defendant claims the instruction, as given, failed to require the jury to determine whether some of defendant's statements were constitutionally protected free speech under the First Amendment. As a corollary, defendant argues his statements to

7

Officer Fox about shooting Kathryn C. qualified as free speech and therefore could not form the basis of a stalking violation.

### A. Forfeiture

Before considering defendant's alleged errors, we first address the People's argument defendant forfeited his instructional challenge by failing to object to the stalking instruction below. "Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 (*Franco*).) Defendant's claim, however, is that the instruction is *not* correct in law, and that it violated his federal constitutional rights because it omitted required elements from the statute. This type of claim need not be preserved by objection before an appellate court can address the issue. (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) We therefore consider defendant's instructional error challenge.

### B. Standard of Review

We determine independently whether a jury instruction correctly states the law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [court "determine[s] whether a jury instruction correctly states the law under the independent or de novo standard of review"].) Our task is to determine whether the trial court " 'fully and fairly instructed on the applicable law.' " (*Ibid.*) We consider the instructions as a whole as well as the entire record of trial, including the arguments of counsel. (*Franco, supra,* 180 Cal.App.4th at p. 720.) If reasonably possible, instructions are interpreted to support the judgment rather than defeat it. (*Ibid.*)

### C. Knowledge Person Is Victim's Immediate Family Member

Based on CALCRIM No. 1301, the trial court instructed the jury on the stalking charge as follows: "The defendant is charged in Count One with stalking in violation of

8

Penal Code Section 646.9. To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully and maliciously harassed or willfully, maliciously, and repeatedly followed another person,

"2. The defendant made a credible threat with the intent to place the other person in reasonable fear for her safety or for the safety of her immediate family, and

"3. A criminal protective order in Placer County Superior Court Case No. 62-96081 and/or a domestic violence no-contact order from Chelan County Superior Court of Washington, Case No. 5103244 prohibiting the defendant from engaging in this conduct against the threatened person was in effect at the time of the conduct.

"A credible threat is one that causes the target of the threat to reasonably fear for his or her safety or for the safety of his or her immediate family, and one that the maker of the threat appears to be able to carry out. A credible threat may be made orally, in writing, or electronically or may be impliedly [*sic*] or may be implied by a pattern of conduct or a combination of statements and conduct. [¶] . . . [¶]

"Immediate family means: (A) Any spouse, parent, children; [¶] (B) Any grandchildren, grandparents, brother, sisters, related by blood or by marriage or [¶] (C) Any person who regularly lives in the other person's household. . . ."

The court's instruction was based on section 646.9, which reads in part: "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . . [¶] . . . [¶]

"(e) For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose.

9

"(f) For the purposes of this section, 'course of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

"(g) For the purposes of this section, 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. The present incarceration of a person making the threat shall not be a bar to prosecution under this section. Constitutionally protected activity is not included within the meaning of 'credible threat.' . . . [¶] . . . [¶]

"(l) For purposes of this section, 'immediate family' means any spouse, parent, child, any person related by consanguinity or affinity within the second degree, or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household." (§ 646.9.)

Defendant's position is that the challenged instruction was not correct in law because the statute must be interpreted to require knowledge that a person is the victim's immediate family member within the meaning of the section 646.9, subdivision (l), before any statements or conduct towards that person can qualify as a credible threat to the victim. According to defendant, statements made to a person other than the victim constitute a credible threat within the meaning of section 646.9, subdivision (g), only if the defendant knows that the person is an immediate family member of the victim. Absent such knowledge, defendant argues, an accused could not harbor the specific intent

10

to place the *victim* in reasonable fear for the safety of that family member. Defendant contends this violates section 20, which requires that "[i]n every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." (§ 20.)

Given the prosecution's theory of the credible threat, however, we need not decide whether knowledge of one's status as an immediate family member of the victim is an implicit element of the stalking statute even though it may lack any explicit statutory requirement. This is because the prosecutor argued that defendant's entire course of conduct--not just his statement to David F. in Kathryn C.'s presence--constituted the credible threat. The statement to David F. was but a minute aspect of this pattern of threatening conduct.

Prior to trial, the judge specifically asked the prosecutor to explain his theory of the threat supporting the stalking charge. After listening to the prosecutor the judge replied, "So your theory is that his course of conduct was intended by him to be a threat to her?" The prosecutor responded, "Yes, your Honor." As the prosecutor preliminarily explained to the judge, this course of conduct included defendant's long history of domestic violence against Kathryn C., his repeated violations of the no contact orders, his statements directly to her that he would not abide by the restraining orders, his threats to David F. in Kathryn C.'s presence outside her home, and his conduct of watching her and contacting her almost on a daily basis every time she left her apartment.

During closing argument, the prosecutor reiterated his theory that defendant's entire course of conduct, and not merely his threat to David F., satisfied the credible threat element under the statute. The prosecutor first asked, "Did his conduct create a credible threat? Did his conduct cause her to fear for her safety?" Later the prosecutor told the jury that, "It is not just the repeated contacts. It is the repeated contacts along with the statements along with the prior history all of that plays into this. . . . [¶] It is not

11

just the fact that he violated the restraining order that is element number 3 of stalking, but his overall course of conduct."

While the prosecutor did refer to the threat to David F. as one aspect of this course of conduct, it was not the only incident forming the basis of the credible threat. When viewing the record in light of the prosecution's actual theory, it is apparent that the real issue below was whether defendant's pattern of conduct implied a credible threat to Kathryn C. and not whether the statement to David F. alone constituted a threat to her. Even defense counsel characterized the threat to David F. and the immediate family issue as a "red herring" or "nonissue." That defendant's appellate counsel, in hindsight, might have argued the matter differently cannot alter the record of what actually occurred.

But even if we assume, without deciding, that the trial court erred by failing to instruct the jury that defendant had to know David F. qualified as Kathryn C.'s immediate family member before the statements to David F. in Kathryn C.'s presence could qualify as a credible threat to her, the error was harmless beyond a reasonable doubt. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 ["a trial court's failure to instruct on an element of a *crime* is federal constitutional error [citation] that requires reversal of the conviction unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict"]; see also *Chapman v. California* (1967) 386 U.S. 18, 24.) The evidence overwhelmingly showed that even without the threat to David F. defendant's entire course of conduct implied a credible threat to Kathryn C.

As the prosecutor reminded the jury, defendant directly threatened Kathryn C. He had an extensive history of domestic violence against Kathryn C.; he physically, mentally, and emotionally abused her. Even defense counsel conceded that defendant "did some horrible things to this woman in the past . . . [p]robably the most horrendous thing he did to her was when he put his arm--she described it as how he was choking her." Based on their extensive domestic violence history, Kathryn C. was justifiably scared of defendant.

Defendant repeatedly disregarded the no-contact orders, even moving in next door to Kathryn C. and seemingly watching her from his apartment. Over the course of a month, defendant contacted Kathryn C. 40 to 50 times--nearly every time she left her home. He bragged about beating people up, told her someone should similarly beat her up after she asked him to leave her alone, told her she should be careful or else something was going to happen to her, and told her there was nothing the police could do to keep him away from her. Similar behavior has been found to constitute a credible threat within the meaning of section 646.9. (See, e.g., *People v. Uecker* (2009) 172 Cal.App.4th 583, 594-596 (*Uecker*) [credible threat implied by defendant's conduct of following victim over seven months, placing hostile notes on her car, and positioning himself so he could see her come and go at work, and calling over 30 times in three weeks and leaving cryptic and irate messages on victim's answering machine constituted credible threat]; *People v. Halgren* (1996) 52 Cal.App.4th 1223, 1233 [defendant's appearance at victim's work, his positioning himself where he could watch people leave the office, his repeated telephone calls insisting victim speak with defendant, and his statements that victim would pay for her rudeness and he would "fix her" or "fix this" constituted a credible threat with clear intent to place victim in fear for safety]; see also *People v. Norman* (1999) 75 Cal.App.4th 1234, 1241, fn. 4 (*Norman*) [defendant's attempt to climb over wall at victim's residence, his lies about his employment and relationship with victim, and statements that he wanted to rape victim was sufficient to constitute credible threat].) On this record, we are convinced beyond a reasonable doubt that any alleged instructional error did not contribute to the verdict.

## D. *Threats Communicated to Third Person*

Defendant next challenges the stalking instruction because it did not inform the jury that before determining defendant's statements to Officer Fox about shooting Kathryn C. constituted a credible threat, the jury had to find defendant intended Officer

13

Fox to convey the statements to Kathryn C. In other words, defendant again asks us to construe section 646.9 as including an additional element not expressly stated in the statute--that of specifically intending that comments to third parties be conveyed to the victim.

While defendant concedes no published decisions have held such an imbedded intent element exists in section 646.9, other courts construing an analogous threat statute have concluded a defendant is guilty of issuing a criminal threat based on his or her threatening statements made to a third person only if there is at least some evidence the defendant intended the third person to relay the threatening words to the victim to accomplish the defendant's goal of instilling fear in the victim. (*In re David L.* (1991) 234 Cal.App.3d 1655, 1659; see, e.g., *In re Ryan D.* (2002) 100 Cal.App.4th 854, 861; *People v. Felix* (2001) 92 Cal.App.4th 905, 913-914 (*Felix*).) To a certain extent, these cases support defendant's argument about an implicit intent to convey requirement.

For example, in *In re David L.*, the court noted "[t]he kind of threat contemplated by section 422 may as readily be conveyed by the threatener through a third party as personally to the intended victim. Where the threat is conveyed through a third party intermediary, the specific intent element of the statute is implicated. Thus, if the threatener intended the threat to be taken seriously by the victim, he must necessarily have intended it to be conveyed." (*In re David L., supra,* 234 Cal.App.3d at p. 1659.) The court inferred the intent that the threat be conveyed to the victim because the defendant made the statement to the victim's friend. (*Ibid.*)

In *Felix*, the defendant made threatening statements about shooting his ex-girlfriend to a psychotherapist while in jail. Given the confidential setting in which the statements were made while discussing highly personal thoughts about homicide, suicide, and his emotions about his ex-girlfriend, the court found the requisite intent to convey lacking. (*Felix, supra,* 92 Cal.App.4th at pp. 913-914)

14

On the other hand, our colleagues in the Second Appellate District, albeit in a somewhat different context, determined that for purposes of a credible threat, it is irrelevant that a victim learns of a stalker's threats through a third person rather than directly from the stalker. (*Norman, supra,* 75 Cal.App.4th at p. 1241, fn. 4.) There, the court considered whether a victim's fear must be contemporaneous with the stalker's threats and harassment in order to violate section 646.9. (*Norman,* at pp. 1235-1236.) Norman, the defendant, was convicted of stalking Steven Spielberg. (*Id.* at p. 1235.) Spielberg was out of the country when Norman, among other things, tried to scale the wall of Spielberg's residence and admitted he wanted to rape Spielberg. (*Id.* at pp. 1236-1238.) Spielberg's lawyer ultimately told Spielberg of Norman's bizarre antics and threatening conduct, which caused Spielberg to fear for the safety of himself and his family. (*Id.* at p. 1237.)

In rejecting Norman's claim that insufficient evidence of a credible threat supported his conviction the court stated, "The fact that Spielberg learned about Norman's threatening conduct from Ramer [his attorney] is irrelevant--it was Norman whose course of conduct . . . was threatening and which created a foreseeable need to inform Spielberg of the danger." (*Norman, supra,* 75 Cal.App.4th at p. 1241, fn. 4.) Thus, whether a defendant intends that words uttered to third parties be relayed to the victim arguably appears irrelevant for purposes of establishing a credible threat under section 646.9. As *Norman* intimates, it is a defendant's entire course of conduct, including conduct and statements to third parties that foreseeably a victim may be told, that is relevant for establishing a credible threat and not necessarily any particular intent that the comments be conveyed to the victim. (*Norman,* at p. 1241, fn. 4.)

*Norman's* conclusion is supported by other opinions that provide, " 'in determining whether a threat occurred [under section 646.9], the entire factual context, including the surrounding events and the reaction of the listeners, must be considered.' " (*Uecker, supra,* 172 Cal.App.4th at p. 598, fn. 10.) As *Uecker* points out, a court "cannot

15

ignore what a victim knows about a defendant, *regardless of how it is learned*, in assessing whether a defendant's behavior rises to the level of a credible threat." (*Ibid.*, italics added.)

In this case, Officer Fox told Kathryn C. what defendant had said. Kathryn C.'s knowledge of these statements, once gained, cannot be ignored when assessing whether defendant's course of conduct rose to the level of a credible threat. (*Uecker, supra,* 172 Cal.App.4th at p. 598, fn. 10.) The fact that Officer Fox conveyed the statements, whether or not defendant intended him to relay the threatening messages, appears irrelevant. (*Norman, supra,* 75 Cal.App.4th at p. 1241, fn. 4.)

But even if we assume, without deciding, that defendant is correct that the trial court erred by failing to instruct the jury he had to intend for Officer Fox to convey his threatening statements to Kathryn C., we are satisfied the error was harmless beyond a reasonable doubt. (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 324.)

The record shows defendant told Officer Fox he intended to immediately return to Kathryn C.'s house as soon as he was released, the restraining order "didn't mean shit," and that nothing could be done if he shot her upon his release. These comments were made to the peace officer who had just arrested defendant for violating a no-contact order after he threatened Kathryn C.'s boyfriend in her presence and outside her home. This evidence is uncontradicted.

Defendant did not make the threatening statements in a confidential setting or during a therapy session. Thus, unlike in *Felix,* defendant had no expectation the statements would remain confidential. Instead, like in *Norman*, it was reasonably foreseeable under these circumstances that defendant's conduct and comments would prompt the arresting officer to inform Kathryn C. about the threatening statements. Assuming the jury had been instructed that defendant had to intend for Officer Fox to relay his threats to Kathryn C., we are confident beyond a reasonable doubt the jury would have inferred such an intent based on the uncontradicted evidence in the record.

16

(*In re David L., supra,* 234 Cal.App.3d at p. 1659 [intent that third party act as intermediary to convey threat to victim was implied]; *People v. Lopez* (1986) 188 Cal.App.3d 592, 602 [uncontradicted evidence defendant knew, or exercising reasonable care should have known, police officers were attempting to arrest him].)

And even had the jury found defendant did not intend for Officer Fox to convey his shooting comments to Kathryn C., defendant still fails to carry his burden to show prejudice in light of the prosecution's credible threat theory, which as discussed above, was that a credible threat against Kathryn C. could be implied from defendant's entire course of conduct rather than merely his statements to Officer Fox. (*Uecker, supra,* 172 Cal.App.4th at p. 597.) The court is satisfied beyond a reasonable doubt the jury would have implied such a credible threat based on defendant's violent history and his pattern of conduct. The alleged instructional error, assuming it occurred, did not contribute to the guilty verdict.

### E. Constitutionally Protected Speech

Defendant next contends the stalking instruction was erroneous because it did not require the jury to determine whether his statements to Officer Fox constituted free speech under the First Amendment, and that because the statements so qualified, they could not form the basis of a credible threat under section 646.9.

Our resolution of the latter issue necessarily resolves the former. We therefore consider first whether defendant's statements to Officer Fox constituted constitutionally protected free speech. We find they do not.

Section 646.9 provides that "constitutionally protected activity" is not included in the statutory definitions of either "course of conduct" or "credible threat." (See § 646.9, subds. (f) & (g).) Thus, if defendant's statements to Officer Fox qualify as "constitutionally protected activity," they cannot form the basis of the stalking charge.

17

The First Amendment protects "expression that engages in some fashion in public dialogue, that is, ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . ." ' " (*In re M.S.* (1995) 10 Cal.4th 698, 710.) "As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression." (*Ibid.*)

A threat constitutes an " ' "expression of an intent to inflict evil, injury, or damage on another." ' " (*In re M.S., supra,* 10 Cal.4th at p. 710.) "When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection." (*Ibid.*) Such comments are "punishable because of the state's interest in protecting individuals from the fear of violence, the disruption fear engenders and the possibility the threatened violence will occur." (*Id.* at p. 714.)

In this case, defendant told Officer Fox the restraining orders "didn't mean shit, and he was going to be out [of jail] in 20 minutes . . . and he was going to go back to [Kathryn C.'s house] immediately." He also told the officer that he could not keep him away from Kathryn C. and that when he got out of jail, if he shot Kathryn C., there was nothing Officer Fox could do about it. Defendant angrily made these statements after having just been arrested for contacting Kathryn C. at her home in violation of the no-contact order and threatening her boyfriend in her presence. Given this context and based on the nature of the comments, it was reasonably foreseeable the officer would believe the victim might be subjected to physical violence at defendant's hand.

That is precisely what occurred when Officer Fox heard defendant's statements. When asked whether he was concerned or worried about the statements, Officer Fox testified, "I took it very seriously that if he's going to make--based on his actions up to

18

this point and based on if he's going to make that claim to a police officer, not only once but twice, I felt it was my job to do the best I can to protect her."

Defendant's reliance on *Watts v. United States* (1969) 394 U.S. 705, 708 (*Watts*), for the proposition that defendant had a First Amendment right to make " ' "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" ' " is misplaced. *Watts* involved a political rally at the Washington Monument in Washington D.C. during the time of the Vietnam War. Watts, a young man attending the rally, informed a group of attendees that he had just received his draft notice and declared he would not report for duty. He then stated, " '[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' " (*Watts,* at p. 706.) Both Watts and those that heard the statement laughed. (*Id.* at p. 707.)

In reversing Watts's conviction for threatening the president's life, the United States Supreme Court considered the context and expressly conditional nature of the statement, as well as the listener's reaction. (*Watts, supra,* 394 U.S. at p. 708.) The high court concluded the statement, rather than a threat, was merely a " 'very crude offensive method of stating a political opposition to the President.' " (*Id.* at p. 708.)

We find *Watts* inapt to the facts of the present case. At the time defendant made the comments about shooting Kathryn C., he was not taking part in a political rally against an unpopular war or the President of the United States. Instead, he had just been arrested for violating a no-contact order and had told the arresting officer that he intended immediately to return to Kathryn C.'s house as soon as he was released from jail. Neither he nor Officer Fox were laughing after defendant twice said that nothing could be done if he shot Kathryn C. upon his release. Although the "political hyperbole" of the sort at issue in *Watts* remains within the "marketplace of ideas" protected by the First Amendment, threats to an arresting officer about physically harming a former girlfriend by shooting her do not constitute such political hyperbole. (*In re M.S., supra*, 10 Cal.4th at p. 711.) Defendant's off-handed comment that the justice system was "fucked up"

19

does not cloak the threat to shoot Kathryn C. in First Amendment protection. As Officer Fox's testimony reveals, the context in which the threatening statement was made conveyed a gravity of purpose so as to constitute speech beyond the pale of the First Amendment. (*Id.* at p. 714 ["Violence and threats of violence, by contrast, fall outside the protection of the First Amendment because they coerce by unlawful *conduct*, rather than persuade by expression, and thus play no part in the 'marketplace of ideas' "].)

Having concluded defendant was not engaged in constitutionally protected First Amendment speech when making the statements to Officer Fox, we next consider whether the trial court erred by not instructing the jury that defendant was not guilty of stalking if his conduct was a constitutionally protected activity.

Defendant concedes a specific instruction regarding constitutionally protected speech under CALCRIM No. 1301 is optional. Because we determined defendant was not engaged in such activity, we reject defendant's argument that the court erred in omitting any reference to constitutionally protected activity when instructing the jury on the stalking charge.

II

*Cumulative Error*

Based on the premise that multiple instructional errors occurred, defendant contends the cumulative impact of the errors mandates reversal of the stalking conviction even if considered individually none of the errors does. Because we find the record overwhelmingly establishes a credible threat based on defendant's entire course of conduct even if defendant's statements to David F. and Officer Fox are disregarded, defendant's cumulative impact argument fails for want of a valid premise. (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1198-1199.)

20

## III

### *Section 654*

Defendant contends the six month concurrent sentences on counts 2 through 4 should have been stayed under section 654 because the acts used to prove the misdemeanor restraining order violations were the same acts used to prove the stalking charge in count 1.  Section 654 prohibits punishing the same act under more than one penal provision.  (§ 654, subd. (a) ["An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision"].)

The People concede the misdemeanor sentences should have been stayed.  We accept the People's concession.

## IV

### *Additional Conduct Credits*

Defendant finally contends he is entitled to additional conduct credits under the most recent amendments to section 4019, and that denying him such credits violates his right to equal protection.  We disagree.

Section 4019 specifies the rate at which conduct credits can be earned by those in local custody before sentencing.  At the time of defendant's arrest on May 20, 2011, former section 4019 entitled defendant to two days of conduct credit for every four days spent in local custody.  The statute provided, "It is the intent of the Legislature that if all days are earned under this section, a term of six days will be deemed to have been served for every four days spent in actual custody."  (Stats. 2010, ch. 426, § 2, eff. Sept. 28, 2010.)  Based on defendant's 175 days of actual presentence custody credit, the court awarded defendant 87 days of conduct credit under the former section 4019.  Defendant concedes his conduct credits were calculated accurately under the prior statute if it applies.

21

In 2011, section 4019 was amended to allow prisoners good conduct credits on a two-for-two basis. The statute presently states, "It is the intent of the Legislature that if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody." (§ 4019, subd. (f).) It is this version of the statute that defendant contends the court should apply to re-calculate his conduct credits. The plain language of the statute as well as the Supreme Court's recent decision in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), compel us to reject defendant's contention.

The Legislature expressly stated the amendment was to be applied prospectively for crimes committed on or after October 1, 2011. (§ 4019, subd. (h) ["The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law"].) Under the statute's plain language, then, the Legislature did not intend the October 2011 amendments to section 4019 to apply retroactively. (See *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1550 [holding same]; *Franco, supra,* 180 Cal.App.4th at p. 720 [courts role in construing statute is to ascertain Legislature's intent so as to effectuate statute's purpose].)

Contrary to defendant's argument, applying amended section 4019 prospectively does not violate equal protection. A nearly identical issue was considered and rejected by the Supreme Court in *Brown, supra,* 54 Cal.4th 314. There, the Supreme Court addressed whether a former amendment to section 4019 that became operative on January 25, 2010, during a state fiscal emergency, should be given retroactive effect so as to permit prisoners who served time in local custody before that date to earn conduct credits at the increased rate provided for by that amendment. (*Brown, supra,* 54 Cal.4th 314.) After concluding retroactive application was not required even though the statute did not

22

expressly contain a prospective application clause (*id.* at pp. 319-320), the court also determined equal protection did not require treating prisoners serving time before and after former section 4019 took effect the same. (*Id.* at p. 329.)

In rejecting the equal protection challenge, the high court emphasized that those serving time before and after the effective date of the amended statute were not similarly situated for equal protection purposes. (*Brown, supra,* 54 Cal.4th at p. 329.) This conclusion logically flowed from the important correctional purposes of a statute like section 4019, which authorizes incentives for good behavior while incarcerated. The statute's purpose is not served by rewarding prisoners who served time before the incentives took effect since they "could not have modified their behavior in response." (*Brown,* at pp. 328-329.) *Brown's* conclusions and holding regarding the January 25, 2010, amendment apply equally to the October 1, 2011, amendment. (See *People v. Ellis, supra,* 207 Cal.App.4th at p. 1552.) We therefore reject defendant's claim he is entitled to conduct credits at the enhanced rate provided by current section 4019.

DISPOSITION

The sentences on the misdemeanor charges are stayed pursuant to section 654. The trial court is directed to prepare an amended abstract of judgment to reflect a stay of each six-month concurrent sentence imposed for counts 2 through 4, and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

                                                                  HULL            , J.

We concur:

      RAYE           , P. J.

      MURRAY       , J.