Filed 3/10/21  P. v. Viveiros CA4/1
### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077015 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD282635) |
| AMANDA THERESA VIVEIROS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Bruce L. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Amanda Theresa Viveiros sought professional help from counselor Amy H. because she had trouble adhering to healthy boundaries in

personal relationships.[1]  In an irony not lost on anyone involved, Viveiros followed Amy for weeks after the therapist ended their sessions because Viveiros crossed clearly established boundaries.  Viveiros was found guilty of stalking as well as improperly accessing and using data from a computer network—convictions she now challenges as unsupported by the evidence and products of a prejudiced jury.  Finding a firm foundation for her convictions in Viveiros's own actions and testimony, and no indications of prejudicial error by the trial court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Amy began seeing Viveiros for individual therapy late in 2018. Because Viveiros sought help with boundary issues,[2] Amy established clear behavioral expectations to create a healthy relational dynamic while they worked on Viveiros's personal growth.  She went over the restrictions many times with Viveiros during their sessions.  Viveiros knew she could not contact Amy on her personal phone, come to her house, or otherwise pursue a relationship outside the bounds of therapy.

Early in their sessions, Viveiros disclosed to Amy that she engaged in stalking behavior with a former therapist who terminated treatment as a result.  Viveiros was hurt by the end of that relationship.  She related a

---

[1]    To protect personal privacy, we omit reference to the victim's last name and refer to her by her first name throughout, intending no disrespect. (Cal. Rules of Court, rule 8.90.)

[2]    Viveiros also sought treatment for other concerns, which remained largely undisclosed throughout the trial to protect her privacy and due to the confidential setting in which these issues were disclosed.  Because further elaboration on the focus of Viveiros's therapeutic sessions is not relevant to the legal issues before us, we continue to exercise this discretion.

specific fantasy of shooting herself in front of the previous therapist, and she told Amy that she owned guns.

In February, Viveiros asked to increase the frequency of her sessions from once a week to twice a week.  Amy obliged.  At some point around then, Viveiros apparently ran internet searches for Amy and found her phone number, home address, and Facebook profile.  She disclosed at least some of these searches in their sessions, and Amy reiterated the boundaries she expected Viveiros to abide by but did not terminate therapy at that time.  Amy only found out later that Viveiros had also been driving in an around her neighborhood since early March.  It took until late May for Amy to decide to stop treating Viveiros after the patient called her three times on her personal cell phone.

These calls were preceded by a tense therapy session on May 29 where Viveiros avoided eye contact with Amy and said very little.  According to Amy, Viveiros did not want to leave her office at the end.  Later that afternoon, Amy missed a call from an unknown number.  She did not pick up because she was not in the habit of answering calls from unknown numbers.  The same number called her two more times, at around 9:00 in the evening and again close to midnight.  She noticed the pattern in the middle of the night, and it occurred to her that it could be Viveiros.  On May 30, she checked Viveiros's file to find her phone number, which confirmed her theory.  Amy then consulted with her supervisor, who understood the boundary implications of Viveiros's phone calls.  They decided she should discontinue treatment and refer Viveiros elsewhere.

Amy called Viveiros that same day to explain her decision.  Viveiros did not take the news well; she was upset, emotional, and in denial about her own behavior.  The following morning, Amy spoke to Viveiros briefly on the

phone again.  She described this conversation as very circular—Viveiros was still upset, remained in denial, and wanted Amy to reconsider seeing her. That was the last direct communication between them, but Viveiros later received a termination letter from Amy's office with recommendations for further treatment options.

Four days later, on the morning of June 3, Amy was pulling into the parking lot of her office when she spotted Viveiros sitting in her parked car, a navy blue Toyota Corolla.  The Corolla was backed into the parking space and Amy could see Viveiros watching her as she drove in.  Viveiros then pulled out to follow Amy's car, and parked again a few spots down from the stall Amy had just pulled into.  Viveiros began to get out of her car, at which point a terrified Amy decided to leave.  She was thinking about Viveiros's fantasy of killing herself in front of her former therapist—who terminated treatment after Viveiros violated established boundaries—and was concerned that she could have replaced the other therapist as the target of Viveiros's renewed anger and pain.  Amy was aware that Viveiros felt very close to her and was hurt by the end of their relationship.  She also remembered that Viveiros owned guns and had difficulty controlling her impulses.  Amy drove away, calling her husband in a panic and then her supervisor, who moved her to a different office location.

Unfortunately, this incident was merely the first in a series of encounters with Viveiros that moved successively closer to Amy's home.  On June 5, Amy was getting her children ready for school when she and her husband, William, both saw a blue Toyota Corolla pass their house.  They discussed it, worried it might be Viveiros, and continued their morning routine.  After Amy dropped the children off at school, she went home and took her dog for a walk around the neighborhood.  One street over from hers,

she saw the car again. Seized by an impulse to confirm whether it was Viveiros, she approached with her phone out and found her former client apparently pretending to be asleep in the reclined driver's seat. Amy took a picture and promptly left. She then asked William to drive by and record the car's license plate, which he did. Amy later learned that on the same day, Viveiros called her office to inquire about her work schedule. Viveiros had parked in a spot that provided a convenient vantage point for monitoring vehicles coming and going from the neighborhood.

After this encounter, Amy became hypervigilant. She stopped exercising at a nearby lake and, when walking her dog, stayed close to houses of neighbors she knew in case she needed help quickly. She saw Viveiros again in late June, driving past her as she walked her dog. Then, on July 2, William saw the blue Corolla parked on their street while he was getting the children ready for camp. He was already in his car when he realized the import of what he had seen. He got back out, looked pointedly at the Corolla, and watched as Viveiros drove away.

Amy and her family took a needed vacation in July, but were again confronted with the ominous Corolla when they returned. This time, on the morning of July 22, Viveiros was parked about three houses down from their residence. Amy stepped outside to walk the dog, saw the Corolla parked facing her house, and immediately went back inside. On this occasion, she called the police. Two officers confronted Viveiros about why she was in the neighborhood and asked questions designed to determine if she was an imminent threat to herself or others. She told them she had gotten off her night shift as an armed guard and alerted them that she had a licensed firearm secured in a safe in the car. As to her presence near Amy's house, she said it was coincidental; she drove for Uber sometimes, and was waiting

for rides that morning.  The officers thought the situation merited further investigation, but based on Viveiros's responses and their knowledge at that point, they did not arrest or further detain her.  They did ask her to leave the neighborhood, and she complied.

Four days later, the San Diego District Attorney filed a felony complaint against Viveiros, alleging one count of stalking (Pen. Code, § 646.9, subd. (a)).[3]  Further investigation revealed that on June 3, Viveiros ran Amy's name multiple times in law enforcement databases to which she had access as a Volunteer in Policing.  She also ran records checks on Amy's husband on June 18.  After a preliminary hearing, the District Attorney filed an information with the stalking charge and an additional count for unlawful access and use of information from a computer system (§ 502, subd. (c)(2)).

The basic facts of what happened were not disputed at trial.  Amy testified in detail, as did Viveiros.  The defense argued Viveiros's intentions were never malicious, that Amy's fear was not reasonable since it was based on a one time fantasy Viveiros had about someone else, and that Viveiros never *used* the information she obtained from the database searches. Viveiros admitted being near Amy's house on every occasion alleged, but testified inconsistently about whether she was there to watch Amy.  She offered other reasons for her presence, reiterating the Uber rationale she used with the officers, and also saying she sometimes ended up in Amy's neighborhood because she liked to exercise at the nearby lake.  But even in offering these innocent explanations for her presence, Viveiros testified it was not necessarily a "coincidence" that she was drawn to the area.  She generally

---

[3]    All further statutory references are to the Penal Code unless otherwise indicated.

admitted parking near Amy's home so she could see her former therapist, but insisted she did not want to be seen. Cell phone records introduced corroborated her presence in and near Amy's neighborhood beginning in early March. After the trial, the jury returned guilty verdicts as to both crimes.

DISCUSSION

Viveiros raises four challenges to her convictions, arguing there was insufficient evidence to find (1) that she intended to frighten Amy, an element of stalking, and (2) that she used the information from the database searches, an element of taking data from a computer network. She also contests (3) the court's decision to admit evidence that she was carrying a firearm in her car on July 22, and (4) the phrasing of the unanimity instruction given to the jury. We reject each of these challenges, finding ample circumstantial evidence to allow a reasonable jury to determine that Viveiros intended to cause Amy fear, and that she used the database information to either find Amy's home address in the first instance or confirm she was watching the right house.

As for the evidentiary ruling, we agree with Viveiros that the gun in her car was irrelevant because that detail was not known to Amy. The trial judge thought it pertinent to establishing that Viveiros made a *credible* threat that put Amy in fear for her safety. But since that element of stalking concerns the fear that arises in the victim's mind, circumstances entirely unknown to the victim are of dubious relevance. Even so, no prejudice arose because the jury was generally aware that Amy knew Viveiros owned guns and that this knowledge factored into her fear.

Lastly, we conclude that the poorly worded unanimity instruction did not prejudice Viveiros. She believes the instruction led the jury astray by suggesting that only one instance of "willfully, maliciously, and repeatedly

7

follow[ing]" could satisfy the stalking charge, when in fact the "repeated" language in the statute necessitates two or more incidents. (§ 646.9, subd. (a).) But Viveiros did not contest her presence near Amy's house or work on any of the incidents alleged by the prosecution—which totaled at least six discreet times where Viveiros followed Amy after their patient-therapist relationship was terminated. And although she generally claimed an innocent intent and offered alternative explanations for some of these incidents, Viveiros admitted she wanted to see Amy on these occasions. Given this testimony, there was no reason for the jury to distinguish between the different incidents to find that Viveiros willfully and maliciously followed Amy only once, and then erroneously convict her of stalking on that basis.

1.  *Sufficiency of the Evidence That Viveiros Intended to Frighten Amy*

To support the stalking charge, the prosecution was required to prove that Viveiros (1) willfully and maliciously harassed or willfully, maliciously, and repeatedly followed Amy, and (2) made a credible threat *with the intent to place Amy in reasonable fear* for her or her family's safety. (§ 646.9; CALCRIM No. 1301.) Viveiros contested the intent element vigorously at trial, and now claims there was insufficient evidence to support her conviction on this point. In evaluating this claim, we construe the evidence in the light most favorable to the judgment and ask only whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Circumstantial evidence can demonstrate guilt, and when such evidence reasonably justifies a conviction, we will not disturb the result on appeal. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) Furthermore, " 'the element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and

8

circumstances disclosed by the evidence.' " (*People v. Lopez* (2015) 240 Cal.App.4th 436, 454 (*Lopez*).)

Here, significant circumstantial evidence supports the jury's conclusion that Viveiros intended to cause Amy to fear for her safety. Viveiros testified to the contrary, saying she never wanted to scare Amy and did not want to be noticed in her neighborhood. She was, however, aware that her presence could frighten her former therapist. Despite her protestations as to a lack of malicious intent, Viveiros's persistent and escalating conduct paints a different picture.

After Amy terminated their therapy sessions on May 30, Viveiros attempted to change Amy's mind when they spoke on the phone on May 31. When Amy would not agree to resume therapy, Viveiros waited in her office parking lot on June 3 and attempted to confront her. Amy made it clear by leaving that she did not want contact. Later that same day, Viveiros ran searches for Amy on law enforcement databases, and on June 5 she was seen driving past Amy's home. She then parked one street over, where Amy spotted her and took her picture. At his wife's urging, husband William then drove past to get her license plate. On the residential street where this occurred, Viveiros was undoubtedly aware of both sightings that day.

If she was truly distressed by the thought that Amy might see her and be frightened, as she testified, her subsequent actions make little sense. In late June, she drove right past Amy walking her dog in the morning. A few days later, she parked *on Amy's street* and watched William getting the children ready for camp. She did not leave until he got out of his car and looked directly at her. Even after this, when she knew she had been seen by Amy and her husband a minimum of three times near their house, she chose her closest parking spot yet on July 22—just a few houses down with her car

9

facing their home. When Amy stepped outside that morning, she saw Viveiros immediately. The jury could view this as strange behavior for someone trying to avoid detection.

Stalking cases are replete with this kind of circumstantial evidence of the defendant's intent to frighten, which is often the only way to prove that element. Defendants who engage in such behavior frequently disclaim any malicious purpose. (See, e.g., *People v. Falck* (1997) 52 Cal.App.4th 287, 299 (*Falck*); *Lopez, supra*, 240 Cal.App.4th 436, 454.) In *Falck*, for example, the defendant developed an obsession with a stranger, sending her black roses and letters explaining that their astrological signs meant they were destined to marry. (*Falck,* at pp. 291–292.) In addition to other relevant factors, the appellate court reasoned that "it can be inferred that [Falck] intended to cause fear in the victim from the fact that he insisted on maintaining contact with her although she clearly was attempting to avoid him." (*Id*. at p. 299.) Similarly in *Lopez*, the defendant followed the victim for years, sending her messages and creating art displays depicting her image. (*Lopez,* at p. 440.) Although he said he never intended to scare her, he was aware she was frightened by him. (*Id*. at p. 442.) The appellate court affirmed Lopez's conviction based in part on his "persistence" as a factor that "amply supports the inference that he intended the result he caused"—which was to put the victim in fear. (*Id*. at p. 454.)

Viveiros tries to distinguish her conduct from the disturbing behavior of defendants like Falck and Lopez, but nothing in these cases suggests they set a floor for actions that circumstantially support the defendant's intention to scare the victim. Viveiros's awareness that Amy knew about her past fantasy of killing herself in front of a former therapist, her lack of impulse control, and her access to guns compounds the menacing nature of her

10

behavior.  She downplays these contextual factors, asserting that the revenge fantasy was over a year old and was disclosed in a therapeutic environment.  But whether Viveiros had an actual, renewed fantasy about harming herself in front of Amy is beside the point; it is her awareness of what Amy knew about her, considered in light of her conduct, that forms the basis for a reasonable inference that she intended to cause Amy fear.  (See *Falck, supra*, 52 Cal.App.4th 287, 297–298 ["Section 646.9 does not require that the defendant actually intend to carry out the threat.  It is enough . . . that the accused makes the threat with the intent to cause the victim to feel . . . fear."].)

*People v. Uecker* (2009) 172 Cal.App.4th 583 illustrates how the defendant's awareness of what the victim knows can add to the circumstantial evidence of intent.  In *Uecker*, the appellate court found sufficient evidence of the defendant's intent to frighten his second victim, a real estate agent, because he called her continually and apparently puzzled out that she had looked him up online and knew he was a sex offender.  The court cited his persistent phone calls, apparent awareness of *her* knowledge of his past, and his hostile tone as sufficient evidence of his intent to frighten her.  (*Id.* at p. 597.)

Similarly here, a number of factors amply support the inference that Viveiros wanted Amy to see her and be frightened.  Viveiros persistently watched Amy in her own neighborhood even after she knew the therapist did not want contact.  She was undoubtedly aware the Amy and her husband had seen her more than once and she knew she could frighten Amy if she was spotted, yet she continued to drive to their neighborhood and watch them.  She also knew Amy was aware she owned firearms and had previously fantasized about killing herself in front of a therapist who ended their

11

relationship on similar terms. All of these factors, coupled with Viveiros's increasingly brazen choice of parking spots, indicate she *wanted* Amy to see her and fear for her safety—perhaps as a punishment for ending their relationship. The jury's conclusion on this point was merited by the evidence.

2. *Sufficiency of the Evidence That Viveiros Used Information from the Database Searches*

In order to prove Viveiros made unauthorized use of information from a database, the prosecution had to show that she (1) knowingly accessed data from a computer system and (2) took, copied, or made use of that data without permission. (§ 502, subd. (c)(2).)

Viveiros had access to four or five databases through her volunteer role with the San Diego Police Department. On June 3 after her unsuccessful attempt to confront Amy in the parking lot, she looked her up on eQuery, a database that shows birthdates corresponding to names. After that, she ran a search for Amy's name in the CLETS database, which can provide home addresses. Later, on June 18, she ran CLETS searches for Amy's husband. She admitted running these searches, but claimed she never used any of the information in any way. She testified she already had Amy's home address from the internet, and could not explain why she looked up William (apparently to see license plate records associated with him) other than to say it was an impulse. She similarly could provide no reason why she ran searches for Amy or the order in which she ran them (first in eQuery, then immediately in CLETS).

Despite her testimony to the contrary, there was plentiful evidence from which a rational jury could conclude that Viveiros actually used the database information—either to find Amy's address for the first time, to confirm an address she found on the internet, or even just to find a particular Amy H. in eQuery with a plausible birthdate, which then enabled her to run

12

a more advanced search in CLETS. That Amy and William saw Viveiros drive past their house on June 5, two days after her first database search, supports the inference that she made quick use of the knowledge she had gained.

Viveiros challenges these conclusions as illogical because cell phone records and her own testimony placed her in and around Amy's neighborhood starting as early as March 1, well before she ran the first database inquiry. But evidence that is compatible with innocence does not warrant reversal when it is also compatible with guilt. (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.) Knowing the general neighborhood and knowing the precise address are two different things. And even if we assume the evidence incontrovertibly demonstrated she knew the precise house location before the database searches, the jury was entitled to infer that she used the databases to confirm the accuracy of information she already possessed. Indeed, this may be the most logical interpretation of what happened but, more importantly for our purposes, it is well supported.

3. *Admission of Evidence That Viveiros Had a Gun in Her Car*

Prior to trial, the defense sought to exclude evidence that Viveiros had a firearm in her car on July 22 when law enforcement officers contacted her on Amy's street. Counsel also asked to exclude mention of the fact that two guns were seized from Viveiros a few days later. The court excluded the later seizure but allowed the prosecutor to introduce evidence that Viveiros had a gun on July 22, finding it relevant to the second element of the stalking charge—the credible threat requirement. (§ 646.9; CALCRIM No. 1301.) Viveiros now challenges this ruling, arguing the evidence was irrelevant to the People's case because any fact tending to demonstrate a credible threat must have been *known to Amy* at the time. Since Amy was not aware that

13

Viveiros had a gun that day, it could not have factored into Amy's fear for her safety.

The relevant section of the statute does indeed frame the credible threat element in terms of the victim's perception. It targets offenders who "make[] a credible threat with the intent to place [the victim] in reasonable fear for his or her safety, or for the safety of his or her immediate family." (§ 646.9.) Although we can find no caselaw directly supporting Viveiros's view that every piece of evidence offered in support of this element must be known to the victim at the time, we find this construction of the statute to be the most reasonable interpretation.

Section 422 provides a helpful analog. This statute criminalizes "true threats" with a specific intent element that the offender means for the victim to understand the communication as a threat. (§ 422; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137.) In determining what the victim must know at the time, courts have held that if the threat is not made directly to the victim, it must be made in such a way that the defendant expects the victim to get the message. (See *In re Ryan D.* (2002) 100 Cal.App.4th 854, 864 [juvenile who painted himself shooting a specific police officer was not guilty of a criminal threat because he did not intend for the officer to see the painting].) Threats communicated to third parties, for example, can satisfy the statute so long as the defendant believed the third party would pass on the message to the intended victim. (See, e.g., *In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [minor who communicated a threat to his victim through the victim's friend harbored the specific intent required].) Given the related principles articulated in these cases, we similarly conclude that factors unknown to the victim cannot help establish the threat was "credible" under section 646.9.

14

But notwithstanding this evidence was irrelevant because Amy knew nothing about the gun, any error in admitting it had no prejudicial effect. The jury was well aware, from both Amy and Viveiros's own testimony, that Viveiros was a gun owner. This was undoubtedly relevant because it factored into Amy's reasonable fear of being followed by her former patient. The jury was also given helpful context that explained why Viveiros had a gun with her on July 22 and mitigated any prejudice that might otherwise have occurred. They heard that she had just come off a night shift as an armed guard, and she stowed her firearm in a safe within her car. The officers who spoke with her that day remarked how the gun was "stored quite well" and that Viveiros's attention to firearm safety was impressive. They also verified that she was licensed to carry the weapon and that she used it for her job.

In short, Viveiros was presented to the jury as a conscientious gun owner with a very legitimate reason for having a firearm in her car on July 22. On this record, we see no likelihood, let alone a reasonable probability, that the jury's knowledge of this fact inflamed their passions by making her seem "scary," and thus impermissibly contributed to the verdict. (See *People v. Partida* (2005) 37 Cal.4th 428, 439.)

4.      *The Unanimity Instruction*

At the close of trial, the court gave an unanimity instruction to the jury that read as follows: "Unanimity. . . . The defendant is charged with stalking in Count 1 sometime during the period of May 29, 2019, to July 22, 2019. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act she committed."

15

Although the defense never asked to amend the instruction's language and raised no objection when it was given, Viveiros now contends that the phrasing of the instruction lessened the People's burden of proof. This is because stalking based on following—as opposed to harassing—requires that the offender "willfully, maliciously, and repeatedly follows" the victim, meaning on more than one occasion. (§ 646.9, subd. (a); CALCRIM No. 1301 ["*Repeatedly* means more than once."].) Viveiros contends the unanimity instruction suggests that "at least one act" of following Amy was enough.

" 'Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court.' " (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 132.) But when the defendant claims that the instruction was not a correct statement of the law and omitted required elements of the crime, "[t]his type of claim need not be preserved by objection before an appellate court can address the issue." (*Ibid*.) Despite the failure to object below, we address this issue on the merits since it concerns the burden of proof for a conviction and proper instruction on the law. In evaluating the propriety of the instructions, we "consider the instructions as a whole as well as the entire record of trial, including the arguments of counsel. [Citation.] If reasonably possible, instructions are interpreted to support the judgment rather than defeat it." (*Ibid*; see also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248; quoting *People v. Burgener* (1986) 41 Cal.3d 505, 539 ["The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." (cleaned up)]; *People v. Fiu* (2008) 165 Cal.App.4th 360, 370–371; *People v. Burnett* (2003) 110 Cal.App.4th 868, 875 (*Burnett*).)

16

The unanimity instruction in this case should have been amended for the stalking allegations, since it was clear throughout the trial (and made explicit in the prosecutor's closing remarks) that the People's case was premised on the theory that Viveiros stalked Amy by following her, which requires a minimum of two incidents. But problematic as the instruction was, Viveiros's claim that it might have confused the jury is unpersuasive. Any confusion was likely cured by other, correct statements of the law. At every other point where the required conduct was explained—including the specific jury instruction for stalking—the term "repeatedly" followed was defined as "more than once." Both counsel emphasized this point in their closing arguments.

But apart from the curative power of the other instructions, it simply makes no sense in this case that Viveiros could have been erroneously convicted of stalking based on only one instance of willfully and maliciously following Amy. Her assertion to the contrary would require us to conclude the following series of events could reasonably have occurred: (1) the unanimity instruction misled the jurors to believe they could convict Viveiros of stalking based on a single incident where she willfully and maliciously followed Amy; (2) they ignored the contrary language in the stalking instruction and persisted in this mistaken belief; (3) they only agreed that Viveiros willfully and maliciously followed Amy once; and (4) they convicted her of stalking on that basis. Since Viveiros did not contest that she went to Amy's office or neighborhood on any of the six instances highlighted in the People's case, this prospect is truly incredible. (See *Burnett, supra*, 110 Cal.App.4th at p. 876 [lack of jury instruction on causation issue not contested by the defendant could not have prejudiced the trial].) Moreover, Viveiros explained her intent on all of these occasions in the same terms; and

17

even when she offered innocent reasons for her presence in Amy's neighborhood, it was half-hearted at best. She declined to say her choice of parking spot was a total coincidence, and admitted she was "drawn" to Amy's home. At one point in her testimony she explained that when she went to Amy's neighborhood, her "goal was to see her."

Accordingly, there is simply no basis for a jury convinced that Viveiros willfully and maliciously followed Amy on at least one occasion to distinguish the other five events. Even under the most stringent prejudice analysis, the error in the unanimity instruction was harmless beyond any reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.